UNITED STATES of America, Plaintiff,

v.

Salvatore SANTORO, Paul Vario, Frank Manzo, Henry Bono, Jr., Harry Davidoff, Frank Calise, John Russo, Heino Benthin, Pasquale Raucci, Leone Manzo, and William Barone, Defendants.

No. 85 CR 100.

United States District Court, E.D. New York.

Parts 1 & 2 May 13, 1986.

Parts 3, 4 & 5 June 18, 1986.

Parts 6, 7 & 8 July 10, 1986.

**156**

Raymond F. Dearie, U.S. Atty., E.D. N.Y., Edward A. McDonald, Atty.-in-Charge, Organized Crime Strike Force, E.D.N.Y., Douglas F. Behm, Sr. Sp. Atty., Strike Force, Brooklyn, N.Y., Norman A. Bloch, Mario DiNatale, Sp. Attys., Strike Force, New York City, for plaintiff.

Samuel H. Dawson, New York City, for Santoro.

Joel Winograd, New York City, for Vario.

Herald Price Fahringer, New York City, for Frank Manzo.

Gustave Newman, New York City, for Bono.

Michael B. Pollack, New York City, for Davidoff.

Schlam, Stone & Dolan, (Peter R. Schlam, of counsel), New York City, for Calise.

Melvin K. Roth, Williston Park, N.Y., for Russo.

Harold H. Seikel, Garden City South, N.Y., for Benthin.

Kenneth J. Weinstein, Garden City, N.Y., for Raucci.

Power, Weiss & Marks (Jonathan Marks, New York City, of counsel), for Leone Manzo.

Joseph Ryan, Mineola, N.Y., for Barone.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This case centers on the activities of a group of individuals alleged to constitute an enterprise called the Lucchese Crime Family. Count One of the indictment charges ten of the eleven defendants with violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(1)(B), (1)(D) and (5), by conspiring to conduct the affairs of that enterprise through a pattern of racketeering activity. In Count One the government also seeks the forfeiture of almost one million dollars pursuant to 18 U.S.C. §§ 1963(a)(1), (3).

The remaining twenty-two counts charge various offenses, most of which involve businesses in or around John F. Kennedy ("JFK") Airport. The crimes charged include: extortion of labor peace payoffs—bribes to ensure that union labor problems would not disrupt business—from several freight companies; extortion involving a proposed merger of two freight companies; insider trading in the stock of one of those

companies; and mail fraud in connection with the purchase of certain bonds.

Defendants have made numerous motions. Some are addressed to the indictment itself. Others seek information or concern the conduct of the government in investigating and prosecuting this case.

## I. *Manzo Electronic Surveillance*

### A. *Inadequacy of Other Investigative Procedures*

Defendants have raised numerous challenges to the electronic surveillance conducted by the government. The first involves two bugs placed in the home of Frank Manzo and a tap placed on Manzo's telephone. Defendants argue that the fruits of these surveillances must be suppressed because the government applications did not meet the "other investigative procedures" requirement of 18 U.S.C. § 2518, which provides, in relevant part:

(1) Each application for an order authorizing or approving the interception of a wire or oral communication ... shall include the following information:

. . . . .

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

. . . . .

(3) Upon such application the judge may enter an ex parte order ... authorizing or approving interception ... if the judge determines on the basis of facts submitted by the applicant that—

. . . . .

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

. . . . .

Defendants contend that the affidavits submitted to establish this "necessity" requirement are insufficient.

The bug orders, which were signed by Judge Weinstein on May 3, 1983 and June 13, 1983, and by Judge Glasser on July 13, 1983, August 12, 1983 and September 14, 1983, rely primarily on the May 3, 1983 affidavit of Federal Bureau of Investigation ("FBI") Special Agent William Carden. The wiretap orders, which were signed by Judge Glasser on July 22, 1983 and by this Court on August 19, 1983 and September 19, 1983, rely on the July 23, 1983 affidavit of Special Agent Martin J. Towey.

Defendants challenge these affidavits on the grounds that they incant ritualistic recitations of the unfeasibility of alternative investigative techniques and provide no reasons specific to this case. If affidavits such as this are sufficient, defendants argue, electronic surveillance would be virtually automatic whenever the government alleges a complicated conspiracy.

The Second Circuit has discussed the inadequacy requirement on many occasions.

[T]he purpose of these "other investigative techniques" requirements "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." .... Moreover, the required showing is to "be tested in a practical and commonsense fashion." 1968 U.S.Code & Admin.News [2122,] 2190. In short, the requirement is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigation techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 982, 39 L.Ed.2d 225 (1974).

*United States v. Martino*, 664 F.2d 860, 868 (2d Cir.1981) (quoting *United States v. Fury*, 554 F.2d 522, 530 (2d Cir.) (footnote omitted), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977)), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982).

[W]hile traditional surveillance techniques need not be exhausted first if they are "impractical" or costly and in-

convenient, *United States v. Robertson,* 504 F.2d 289, 293 (5th Cir.1974), *cert. denied,* 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975), nevertheless Congress—and, we may add, the New York legislature—

> evinced the clear intent to make doubly sure that the statutory authority be used with restraint.... These [wiretap] procedures were not to be routinely employed as the initial step in criminal investigation. Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.

*United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974).

*United States v. Lilla,* 699 F.2d 99, 102–03 (2d Cir.1983).

> The requirement of a "full and complete statement" regarding procedures attempted or considered prior to the application for a wiretap serves both to underscore the desirability of using less intrusive procedures and to provide courts with some indication of whether any efforts were made to avoid needless invasion of privacy. Like other courts, we reject generalized and conclusory statements that other investigative procedures would prove unsuccessful.

*Id.* at 104 (citations omitted). But "[n]either the New York nor the federal statute requires that any particular investigative procedures be exhausted before a wiretap may be authorized. Wiretaps are 'neither a routine initial step nor an absolute last resort.' Note, *The United States Courts of Appeals: 1975–76 Term Criminal Law and Procedure,* 65 Geo.L.J. 209, 247 (1976)." *Id.*

■ "Viewing the affidavits submitted in support of the wiretap [and bug] applications in a ' "common sense and realistic fashion," ' " and with the deference properly accorded to the issuing judge," *United States v. Ruggiero,* 726 F.2d 913, 924 (2d Cir.) (citations omitted), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984), I find that the affidavits here satisfy the statutory requirements. They amply detail the wide-ranging nature of the alleged conspiracy and the reasons why traditional methods had proven and would prove to be insufficient.

The enterprise that was being investigated allegedly centered on a major organized crime family that controlled a powerful labor union and used that relationship to engage in various illegal activities—including extortion of labor peace payoffs—involving several businesses operating at JFK Airport. "This was no 'small time ... case' ... where simple investigative techniques might have sufficed, but a far-flung conspiracy that was impenetrable except by sophisticated electronic means." *United States v. Wilkinson,* 754 F.2d 1427, 1434 (2d Cir.), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

The affidavits make clear that for fear of retaliation witnesses were unwilling to testify. The same threat of violence made undercover infiltration too dangerous, and the suspicious, close-knit nature of the target group made such an approach quixotic. Physical surveillance and telephone records had proven of limited usefulness because they did not reveal the subject matter of the meetings and conversations, and thus gave little insight into the scope of the conspiracy.

Search warrants were also unlikely to be fruitful because the crimes being investigated were not of a sort to be memorialized in written records. Finally, grand jury investigations and interviews would tip the government's hand by exposing the investigation, thus probably preventing the gathering of evidence as to the full scope of the operation. Thus, viewing the case in a "common sense and realistic fashion," *U.S. v. Ruggiero, supra,* 726 F.2d at 524, the inadequacy of alternative investigative techniques was amply and specifically demonstrated. *See generally U.S. v. Ianniello,* 621 F.Supp. 1455, 1464–66 (S.D.N.Y. 1985); *U.S. v. Persico,* 621 F.Supp. 842, 863–65 (S.D.N.Y.1985).

Defendants argue that the Court, in analyzing the adequacy of the government's showing, should discount the unwillingness of witnesses to testify. They suggest that before resorting to electronic surveillance, the government should have threatened those witnesses—informants and employer/victims—with contempt, RICO or obstruction prosecutions in order to coerce their testimony. Aside from the fact that such an approach might compromise confidential sources or expose the investigation, I do not believe Congress intended that the government be required to prosecute victims and marginal actors in a criminal enterprise before being permitted to use electronic surveillance to gather evidence against those it believes to be the main wrongdoers. The government need not show that it has exhausted every conceivable avenue of investigation. *United States v. Terry*, 702 F.2d 299, 310 (2d Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983).

Defendants next argue that even if the original affidavits adequately explained why alternative techniques were not feasible, subsequent applications failed to show a continuing need for electronic surveillance. I disagree.

Having examined the later applications, I find that they meet the requirements of the statute. That useful evidence was gleaned from the prior interceptions did not make traditional techniques any less risky or any more likely to succeed. It is easy to engage in "Monday morning quarterbacking as to what investigative techniques the agents should have employed," but I am satisfied that the government has met its burden of providing "[a] reasoned explanation, grounded in the facts of the case, [that] 'square[s]' with common sense.'" *United States v. Shipp*, 578 F.Supp. 980, 989 (S.D.N.Y.1984) (quoting *United States v. Lilla*, 699 F.2d 99, 105 (2d Cir.1983)), *aff'd sub nom. United States v. Wilkinson*, 754 F.2d 1427 (2d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

Finally, defendants argue that even if the affidavits are adequate on their faces, the Court should order a hearing to test the veracity of the representations contained therein. Defendants wish to question the agents about, for example, the unwillingness of witnesses to testify and the impracticality of infiltrating the alleged conspiracy.

Defendants are not entitled to an evidentiary hearing merely because they disagree with the government's or the issuing judge's assessment of the situation described in the application or because they wish to elicit further details about the investigation. "There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). The conclusory allegations of defendants do not constitute the "substantial preliminary showing" which must be made in order to entitle them to a hearing. *Compare, e.g., United States v. Figueroa*, 750 F.2d 232, 237 (2d Cir.1984) (mere allegation that events described in affidavit did not take place is insufficient to meet "sensible threshold" required for a hearing) (quoting *Franks v. Delaware, supra,* 438 U.S. at 170, 98 S.Ct. at 2683) *with United States v. Ippolito*, 774 F.2d 1482, 1484 (9th Cir.1985) (agent told witness to refuse to testify so that necessity of wiretap could be demonstrated; government "did not seriously challenge the fact of intentional deception").

Accordingly, for the reasons stated above, I find that there has been no violation of 18 U.S.C. §§ 2518(1)(c), (3)(c) with regard to either the Manzo bugs or the Manzo wiretap.

B. *Minimization*

Defendants next seek suppression of the fruits of the electronic surveillance at the Manzo home on the ground that the agents failed to properly minimize the interception of nonpertinent conversations. Defendant Frank Manzo has standing to raise a mini-

mization challenge to these surveillances. *See United States v. Fury,* 554 F.2d 522, 526 (2d Cir.1977) (minimization claim can be raised only by one with a privacy interest in the place of surveillance), *cert. denied,* 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978).

Defendants contend that the agents intercepting conversations through the bugs of the Manzo home engaged in "live monitoring," which is the practice of listening to conversations without recording them. Defendants also point to several allegedly improper interceptions as evidence of a general disregard of both Title III, 18 U.S.C. §§ 2510–2520, and of the terms of the court orders permitting the surveillance. They seek suppression of all fruits of the bugs (which would, they allege, include the wiretap and its fruits) or, in the alternative, a hearing to further investigate their minimization claims.

18 U.S.C. § 2518(5) provides, in pertinent part:

> Every order and extension thereof shall contain a provision that the authorization to intercept ... shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter
> ...

In addition, the orders authorizing the bugs each contained the following provision:

> [N]o interception of oral communications shall occur during periods when it is determined that none of the subjects of this Order ... are at the above described premises, and ... no interception of oral communications shall take place, even when [the subjects] are at the above-described premises, if the conversation is non-criminal in nature.

"[D]etermining the adequacy of minimization measures 'requires an evaluation of the reasonableness of the actual interceptions in light of the purpose of the wiretap and the totality of the circumstances before any inquiry is made into the subjective intent of the agents conducting the surveillance.'" *United States v. Ianniello,* 621 F.Supp. 1455, 1469 (S.D.N.Y.1985) (quoting *Scott v. United States,* 436 U.S. 128, 131, 98 S.Ct. 1717, 1720, 56 L.Ed.2d 168 (1978)).

Courts have isolated several factors in assessing the reasonableness of minimization efforts. For example, minimization may be more difficult, and more extensive surveillance may therefore be permitted, if: 1) the investigation focuses on a widespread conspiracy, *see Scott v. United States, supra,* 436 U.S. at 140, 98 S.Ct. at 1724; *United States v. Napolitano,* 552 F.Supp. 465, 476 (S.D.N.Y.1982); 2) the nature of the conversations or the alleged crimes makes it difficult to determine pertinence, *see United States v. Hinton,* 543 F.2d 1002, 1012 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *United States v. Lilla,* 534 F.Supp. 1247, 1267 (N.D.N.Y.1982), *rev'd in part on other grounds,* 699 F.2d 99 (2d Cir. 1983); *United States v. Bynum,* 360 F.Supp. 400, 410 (S.D.N.Y.), *aff'd,* 485 F.2d 490 (2d Cir.1973), *vacated on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); or 3) the targets use jargon or code words or speak in a foreign language, *see United States v. Hinton, supra,* 543 F.2d at 1012; *United States v. Lilla, supra,* 534 F.Supp. at 1268; *United States v. Cale,* 508 F.Supp. 1038, 1041 (S.D. N.Y.1981). In addition, the agents may have more leeway at the start of a surveillance when they are less familiar with the subjects. *See United States v. Scott, supra,* 436 U.S. at 141, 98 S.Ct. at 1725; *United States v. Napolitano, supra,* 552 F.Supp. at 476.

In addition, courts have identified several measures which, if taken by the government, make a finding of compliance with § 2518(5) more likely. These include: 1) maintenance of monitoring logs, *see United States v. Hinton, supra,* 543 F.2d at 1012; *United States v. Rizzo,* 491 F.2d 215, 217 (2d Cir.), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974); 2) judicial supervision of the progress of the surveillance, *see United States v. Bynum, supra,* 360 F.Supp. at 410; and 3) supervision by the prosecutor, *see United States v.*

*Rizzo, supra,* 491 F.2d at 217; *United States v. Bynum, supra,* 360 F.Supp. at 410. The fact that no privileged conversations were recorded may also show that the agents have abided by the statute and orders. *See United States v. Rizzo, supra,* 491 F.2d at 217.

Actual evidence of minimization by the monitoring agents can be gleaned by scrutinizing

> *inter alia,* the type of criminal enterprise being investigated; the scope of that enterprise and the number of participants, known and unknown, involved therein; the number of days for which electronic surveillance is conducted; the scope of the authorizing order; the activity [in] the [premises] being monitored; the number of [conversations]; the number of monitored [conversations]; the location of the [bugs]; the length of [conversations]; the participants in those [conversations];, the content of [conversations] as reasonably perceived at the time of [interception]; the experience of the agents deployed for the investigation; the various pressures on the agents executing the investigation; the procedures planned and/or followed to monitor [interceptions]; the equipment employed in the surveillance; and, most of all, the supervision of the interception by the investigating agency, the supervising attorney, and by the authorizing Court.

*United States v. Bynum, supra,* 360 F.Supp. at 410.

██ Having reviewed the affidavits, the monitoring logs, the reports submitted to the supervising judges, and the instructions given to the agents, and having evaluated those documents in light of the principles discussed above, I conclude that the government has made a prima facie showing of compliance with both § 2518(5) and the court orders.

First of all, several procedures designed to ensure proper minimization were established. The agents were instructed by their supervisor on the maintenance of accurate logs and by an Organized Crime Strike Force attorney on the legal requirements for minimization of irrelevant interceptions. It was made clear that there was to be no monitoring without recording and that there was to be no automatic recording. Each agent was required to read all instructions, court orders and applications, and copies of each were posted in the monitoring plant. In addition, the prosecutors personally delivered weekly progress reports to the supervising judges.

Moreover, minimization was complicated by the nature of the surveillance. The target premises was a residence used as an office; thus, relevant conversations were not confined to particular areas or times of day. Manzo speaks heavily accented English and often conversed in Italian, and interceptions were frequently obscured by television noise or music. The enterprise being investigated involved many known and unknown parties and various criminal activities.

These factors made it difficult to tell whether a conversation was pertinent, but it appears that the agents complied as best they could with their minimization obligations. The logs reveal that listening ceased once it was determined that the interception was irrelevant. The majority of interceptions appear to be one- to three-minute spot checks that took place ten to thirty minutes apart.

Because I find that the conduct of the surveillance in this case was reasonable under the circumstances, the government has met its burden of demonstrating the adequacy of its minimization measures. The evidence before me indicates that "the agents comprehended and conscientiously attempted to fulfill their responsibility to minimize the intrusion upon communications not subject to the surveillance order." *United States v. Ianniello, supra,* 621 F.Supp. at 1470. Accordingly, no hearing is warranted unless defendants can demonstrate "that a substantial number of nonpertinent conversations [were] intercepted unreasonably." *United States v. Cirillo,* 499 F.2d 872, 881 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974); *see United States v. Ramirez,* 602

F.Supp. 783, 791 (S.D.N.Y.1985). This they have failed to do.

Defendants' claim of live monitoring is based on speculation as to how the equipment may have been set up. Their claim that the monitoring records have been falsified is based on alleged discrepancies in the logs between the number of minutes a conversation took and the amount of tape it took to record it, but they point to no specific conversations or log entries, despite having had the opportunity to submit a reply to the government's opposition to their motions. They do point to certain conversations as illustrative of a pattern of the monitoring of irrelevant discussions, but the explanations provided by the government satisfy me that those interceptions were proper.

"It is virtually impossible to completely exclude all irrelevant matter from intercepted conversations," *United States v. Rastelli*, No. 85 CR 354, slip op. at 40 (E.D.N.Y. Feb. 27, 1986) (quoting *United States v. Schwartz*, 535 F.2d 160, 164 (2d Cir.1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 581 (1977)), and indeed "[t]he statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveilance in such a manner as to 'minimize' the interception of such conversations," *United States v. Scott, supra*, 436 U.S. at 140, 98 S.Ct. at 1724.

Because I find that the government has made a prima facie showing of compliance with the § 2518(5) and the court orders, and because defendants have failed to demonstrate a substantial number of unreasonable interceptions or any other reason to doubt the good faith of the government, *see United States v. Ianniello, supra*, 621 F.Supp. at 1470–71, the motion to suppress, or in the alternative for a hearing, is denied.

## C. *Audibility Hearing*

Defendants have demanded an audibility hearing in order to obtain pre-trial rulings on the admissibility of the tapes the government intends to offer into evidence. The government has not yet decided exactly which tapes it will use, but has agreed to do so within a reasonable time. Once that is accomplished, the Court will schedule hearings to rule on the admissibility of any portions of the tapes on which the parties cannot agree.

## D. *Sealing*

Defendants argue that the fruits of the tap of the Manzo phone and the bug of the Manzo home must be suppressed because the government failed to have the tapes sealed in a timely manner.

The relevant statute, 18 U.S.C. § 2518(8)(a), requires that the fruits of an electronic surveillance order be turned over to the issuing judge for sealing "[i]mmediately upon the expiration of the period of the order." The presence of a seal, or a satisfactory explanation for its absence, is a prerequisite to the admission into evidence of such tapes. *Id.* Our prior cases have established that when the sealing is not done immediately, the government must provide a satisfactory explanation for the delay, even if a seal is present at the time the tape is sought to be introduced. *United States v. Vasquez*, 605 F.2d 1269, 1274 (2d Cir.) *cert. denied*, 444 U.S. 981, 100 S.Ct. 674, 62 L.Ed.2d 649 (1979); *United States v. Gigante*, 538 F.2d 502, 506 (2d Cir.1976). Any delay beyond two days triggers the satisfactory explanation requirement. *Vasquez*, 605 F.2d at 1278.

*United States v. Massino*, 784 F.2d 153, 156 (2d Cir.1986) (footnote omitted). "The judicial sealing requirement ... provides an external safeguard against tampering with or manipulation of recorded evidence." *United States v. Gigante, supra*, 538 F.2d at 505. The obligation to present the tapes for sealing does not arise, however, until the wiretap order and any extensions thereof have expired. *See* 18 U.S.C. § 2518(8)(a) (tapes to be sealed "[i]mmediately upon the expiration of the period of the order, or extensions thereof ...").

■ The following charts show when the surveillances in this case were ordered, when those orders expired, and when the tapes were sealed:

Bug

| Order | Signed | Expired | Sealed |
|---|---|---|---|
| 1 | 5/3/83 | 6/2/83 | 6/3/83 |
| 2 | 6/13/83 | 7/13/83 | 7/15/83 |
| 3 | 7/13/83 | 8/12/83 | 8/15/83 |
| 4 | 8/12/83 | 9/11/83 | 9/12/83 |
| 5 | 9/14/83 | 10/14/83 | 10/17/83 |

Tap

| Order | Signed | Expired | Sealed |
|---|---|---|---|
| 1 | 7/22/83 | 8/21/83 | 8/23/83 |
| 2 | 8/19/83 | 9/18/83 | 9/19/83 |
| 3 | 9/19/83 | 10/19/83 | 10/20/83 |

The government's explanation obligation is triggered by a delay of more than two days, *see United States v. Vasquez, supra*, 605 F.2d at 1278, and here there are only two such instances.[1] Moreover, if the subsequent orders are extensions of the first, the two-days-or-explain test is applied only to the last sealing in the series.

[T]he term "extensions," as used in the phrase "period of the order, or extensions thereof" is to be understood in a common sense fashion as encompassing all consecutive continuations of a wiretap order, however designated, where the surveillance involves the same telephone, the same premises, the same crimes, and substantially the same persons.

*Id.* A review of the bug orders reveals that all involved the exact same location, identical offenses, and substantially the same targets.[2] The same is true of the tap orders.[3] Each set of orders thus constitutes a "continuous authorized [surveillance]," *id.* at 1277, so the obligation to seal the tapes arose upon the expiration of the last order in each series.[4]

■ The final tap order expired on October 19, 1983, and the tapes were presented to this Court on October 20, 1983. Defendants cannot reasonably expect sealing to take place any more "immediately" than that. The final bug order expired on October 14, 1983, a Friday. They were sealed by Judge Glasser on Monday, October 17, 1983. In light of the statutory requirement that the sealing be done by the judge who issued the order, *see* 18 U.S.C. § 2518(8)(a), and appreciating the logistical difficulties of getting orders signed on weekends, the sealing was accomplished as immediately as was possible.

Even if the intervening weekend means that the sealing was not immediate within the meaning of the statute, I am satisfied by the government's explanation for the delay.

1. The tapes from Bug Orders 3 and 5 were not sealed within two days. Defendants erroneously characterize Tap Order 1 as involving a four-day sealing delay. Because Tap Order 2 was signed on August 19, 1983, they assume that Tap Order 1 must have expired on that date, and that the sealing on August 23 was therefore improper. Tap Order 1, however, by its terms expired on August 21, 1983, so the sealing on August 23 was sufficient. That the periods of the orders overlapped does not alter the fact that "18 U.S.C. § 2518(8)(a) requires immediate sealing at the expiration of the period for which surveillance was authorized rather than upon the cessation of actual surveillance." *United States v. Venuti*, 625 F.Supp. 1460, 1461 (S.D.N.Y.1986) (footnote omitted).

Defendants similarly mischaracterize the delay in sealing the tapes from Bug Order 1. Although a malfunction caused interceptions to cease on May 29, 1983, the order did not expire until June 2, 1983. The sealing on June 3, 1983 was properly accomplished within one day, *see id.*, not within five, as defendants would have it.

2. Defendants Calise and Frank Manzo and a Richard Schroeder were named as targets of all five bug orders. Defendants Vario, Russo and Leone Manzo were subjects of three of the five orders, and defendant Barone and another individual were named in the last order.

3. Defendants Calise, Vario, Russo and Frank Manzo were named as targets in all three tap orders. Defendants Bono and Leone Manzo were subjects of two of the three orders, and six other individuals were named in the last order.

4. That the government undertook to seal the tapes at intervals prior to the expiration of the final order does not mean that it was under any obligation to do so. *See United States v. Persico*, 621 F.Supp. 842, 865–66 (S.D.N.Y.1985). Defendants cannot be heard to complain about this practice, which offers them protection beyond that which is required by the statute.

[T]he factors considered in assessing the acceptability of the explanation have included the length of the delay, . . .; the amount of time need to prepare the tapes for sealing, . . .; the diligence of law enforcement personnel in performing the necessary pre-presentment tasks, . . .; the foreseeability and urgency of circumstances diverting the attention and energies of those responsible for the presentation of the tapes to other matters, . . .; evidence of any tampering with the tapes or of any other prejudice to the defendants, . . .; and any evidence of bad faith on the part of law enforcement agencies, such as "any intent to evade statutory sealing requirements or to gain any tactical advantage," . . . .

In most cases when (1) the government has advanced reasons for the delay, such as the need to perform administrative tasks relating to the tapes prior to sealing, (2) there is no basis for inferring that the government sought by means of the delay to gain a tactical advantage over the defendant or that it had any other improper motive, and (3) there has been no showing that there has been tampering with the tapes or that the defendant has suffered any other prejudice as a result of the delay, the government's explanation has been accepted as satisfactory.

*United States v. Rodriguez,* 786 F.2d 472, 477 (2d Cir.1986). There is no indication here that the government was anything other than conscientious in executing its sealing duties, nor is there any sign of prejudice to the defendants. The two-day absence of the issuing judge is more than sufficient to excuse such a brief delay.

Even if the individual orders are not regarded as extensions, and each was therefore subject to the immediate sealing requirement, there would be no reason to suppress the tapes. Six of the eight sets of tapes were sealed within two days, and two were sealed on the first Monday after the Friday the orders expired. If an explana-

tion is needed for any of these so-called delays, the performance of the administrative tasks (such as transportation and duplication of the tapes and preparation of boxes and paperwork) required to ready the tapes for sealing is more than sufficient to justify these short intervals. *See United States v. Persico, supra,* 621 F.Supp. at 866 ("[D]elays of three or four days in sealing . . . are excusable. Short delays of this kind have rarely compelled suppression.") (collecting cases).

Defendants would have the Court read the term "immediately" in § 2518(8)(a) as requiring that tapes be sealed the instant the authorizing order expires. As the case law in this Circuit makes clear, such an approach is neither mandated nor practicable. The government proceeded quickly and diligently to have the tapes sealed, and the statute demands no more than that. Accordingly, the motion to suppress is denied.

## II. *The Mail Fraud Count*

Defendants have moved to dismiss Count Twenty-three, which charges Frank Manzo, Leone Manzo, Paul Vario and William Barone with mail fraud in connection with the purchase of $250,000 worth of bonds issued by Sullivan County, New York. Specifically, the government alleges that the defendants used the mails to conceal the source of the cash used to buy the bonds and the fact that it was the defendants who were the buyers. They did so, the government charges, by causing the bonds to be purchased through intermediaries. The mailing charged in the indictment took place when Barone returned to the bond broker's auditor an account statement that showed Barone as the buyer of the bonds; Barone noted on the form that the transaction was in error. The broker subsequently amended Barone's statement to delete the bond transaction.

18 U.S.C. § 1341 makes it a crime to use the mails to further a "scheme or artifice to defraud."[5] The entity that has been

5. 18 U.S.C. § 1341 provides, in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for

defrauded, according to the indictment, is the United States government, which has allegedly been deprived of its "ability to gather information required to be kept by [the broker] pursuant to the [securities laws]" (Count 23, ¶ 4). In short, the government charges the defendants with mail fraud for having provided inaccurate information to a brokerage firm, which, in carrying out *its* statutory disclosure. obligations, in turn provided inaccurate information to the government. This theory on its face seems attenuated, and an analysis of the mail fraud statute and cases confirms that while the wrongful conduct alleged might well constitute a violation of various federal statutes,[6] it does not constitute mail fraud.

To prove a violation of § 1341, the government must establish that the defendant participated in a scheme to defraud and that postal channels were used to further that scheme. *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. Corey,* 566 F.2d 429, 430 n. 2 (2d Cir.1977). There are two types of schemes to defraud: those which cause the victim economic loss and those which deprive the victim of intangible rights. *United States v. Richter,* 610

---

obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purposes of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

6. The conduct alleged might constitute a violation of the underlying disclosure statute, even though that statute is directed to the broker. Courts have upheld convictions under disclosure statutes of bank customers who conceal information from their banks, causing the banks to submit inaccurate reports to the government. *See, e.g., United States v. Cook,* 745 F.2d 1311 (10th Cir.1984), *cert. denied,* 469 U.S. 1220, 105 S.Ct. 1205, 84 L.Ed.2d 347 (1985); *United States v. Puerto,* 730 F.2d 627 (11th Cir.), *cert. denied,* 469 U.S. 847, 105 S.Ct. 162, 83 L.Ed.2d 98 (1984); *United States v. Thompson,* 603 F.2d 1200 (5th Cir.1979); *United States v. Richter,* 610 F.Supp. 480 (N.D.Ill.1985), *aff'd mem. sub nom. United States v. Mangovski,* 785 F.2d 312 (7th Cir.1986); *United States v. Konefal,* 566 F.Supp. 698 (N.D.N.Y.1983). *But see United States v. Anzalone,* 766 F.2d 676 (1st Cir.1985) (defendant cannot be convicted under statute that imposes duty only on the bank).

Defendants might also have violated 18 U.S.C. § 1001, which makes it a crime to knowingly and willfully conceal a material fact in any matter within the jurisdiction of a federal agency. *See United States v. Puerto, supra; United States v. Tobon-Builes,* 706 F.2d 1092 (11th Cir. 1983); *United States v. Richter, supra.*

These courts have used an aiding and abetting theory, *see* 18 U.S.C. § 2(b) (defendant punishable as a principal if he willfully causes an act to be done which if directly performed by him or another would be a crime), to find liability for causing an innocent intermediary to violate a statute. *See United States v. Ruffin,* 613 F.2d 408, 412–13 (2d Cir.1979) (one who causes another to commit a criminal act may be found guilty as a principal even though agent who committed the act is innocent or acquitted).

The aiding and abetting theory does not help the government to establish mail fraud here. Although defendants may have aided and abetted the innocent broker in violating the disclosure requirement or in making a false statement, the brokerage firm's actions do not constitute mail fraud, so defendants cannot be guilty of that crime as aiders and abettors. Unlike the disclosure or false statement violations, in which the defendant can be guilty simply for causing the innocent third party to take or not take an action—make the statement or fail to make the disclosure—mail fraud requires both that a mailing take place and that it be in furtherance of a scheme to defraud. No conduct of the broker helps the government to establish either of those elements.

The broker's action cannot be deemed to satisfy the mailing requirement. The mailing alleged in the indictment is Barone's to the broker, not the broker's to the government. Barone does not appear to deny having sent the note, so the government has no need to rely on an aiding and abetting theory on this point. Nor can the broker be said to part of a scheme to defraud. One can "innocently" violate a disclosure statute, but one cannot innocently defraud. Moreover, as discussed *supra* at pages 27–31, liability under the mail fraud statute for concealment requires that the defendant owe an independent duty to the victim. This element is lacking here. Thus, the act of failing to disclose the true owner of the bonds, even "if directly performed by" defendant, cannot constitute mail fraud.

F.Supp. 480, 494 (N.D.Ill.1985), *aff'd mem. sub nom. United States v. Mangovski,* 785 F.2d 312 (7th Cir.1986); *see United States v. Weiss,* 752 F.2d 777, 784 (2d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985). In this case the government alleges that the defendants defrauded it of its intangible right to receive accurate information from the broker.

The defendants argue that they cannot be held liable for a deprivation of an intangible right in the absence of a fiduciary duty owed to the victim. In other words, they contend that they can be convicted of mail fraud only if they had a fiduciary duty to provide the accurate information of which the government was allegedly deprived. Because no such duty exists here—it is the broker who is obligated by the securities laws to disclose transactions to the government—they argue that they cannot be liable for mail fraud. Although their statement of the law is not quite accurate, their conclusion is correct.

It is true that many intangible rights mail fraud cases involve defendants who owe a fiduciary duty to the defrauded party, *see, e.g., United States v. Newman,* 664 F.2d 12, 19–20 (2d Cir.1981) (employer/employee); *United States v. Dorfman,* 532 F.Supp. 1118, 1123 (N.D.Ill.1981) (pension fund trustee), and indeed one court has held that the existence of such a duty is required in a mail fraud prosecution based on a deprivation-of-intangible-rights theory, *see United States v. Richter, supra,* 610 F.Supp. at 494–95.

The government responds by citing several cases in which a defendant has been found to have defrauded the United States in the absence of a fiduciary relationship. *See, e.g., United States v. Southland Corp.,* 760 F.2d 1366, 1382 (2d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 82, 88 L.Ed.2d 67 (1985); *United States v. Puerto,* 730 F.2d 627, 630–31 (11th Cir.), *cert. denied,* 469 U.S. 847, 105 S.Ct. 162, 83

L.Ed.2d 98 (1984). Those cases however, arise not under the mail fraud statute, but under 18 U.S.C. § 371, which proscribes conspiracy to defraud the United States.

It is well settled that "fraud" for purposes of § 371 "is not confined to fraud as that term has been defined in the common law," *Dennis v. United States,* 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966), and that that section reaches " 'any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government,' " *id.* (quoting *Haas v. Henkel,* 216 U.S. 462, 479, 30 S.Ct. 249, 253, 54 L.Ed. 569 (1910)); *see Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924). This is a broad standard, and there is no requirement that there be any duty owed the government by the defendant. *See United States v. Richter, supra,* 610 F.Supp. at 495. A defendant can interfere with a governmental function by concealing information even if he has no direct duty to disclose it, if he conceals it from an entity that he knows does have a duty to disclose it. *See United States v. Puerto, supra,* 730 F.2d at 633 (§ 371 violation where defendant structured deposit so that bank would not file with government reports required for currency transactions in excess of $10,000; defendant defrauded government by obstructing its function of receiving accurate reports); *United States v. Richter, supra,* 610 F.Supp. at 486 (same).

It has never been held, however, that conduct that defrauds the United States under the broad § 371 standard of interference with a governmental function constitutes a "scheme to defraud" for purposes of the mail fraud statute, 18 U.S.C. § 1341; and the government has pointed to no case that would support such a proposition. Nor has it directed the Court to a § 1341 prosecution for concealing information[7] in

---

7. Courts have distinguished between mail fraud schemes involving active misrepresentation and those involving nondisclosure or concealment of information the defendant is obligated to disclose. *See, e.g., United States v. Dowling,* 739

F.2d 1445, 1448–49 (9th Cir.1984), *rev'd in part on other grounds,* 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985). The Barone note could be regarded as falling in the first category in that it contained an affirmative statement that

which the defendant did not have a duty to disclose.

The government disputes defendants' claim that that duty must be of the fiduciary variety, and one court has agreed with that position, *see United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir.1984), *rev'd in part on other grounds*, 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985). That court, however, did not accept the government's broad argument that the duty the breach of which creates mail fraud is simply the duty not to commit an illegal act. *See id.* ("[T]he presence of illegal conduct alone may [not] constitute the basis of the 'fraud' element of a mail fraud prosecution."). Rather, it held that nondisclosure constitutes fraud "only ... where there exists an independent duty" to disclose. *Id.* That independent duty may arise from a fiduciary relationship or an explicit statutory requirement. *Id.; see, e.g., United States v. Siegel*, 717 F.2d 9 (2d Cir.1983) (executive's mail fraud conviction based on breach of fiduciary duty owed to corporation and shareholders); *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982) (political official's mail fraud conviction based on breach of fiduciary duty owed to public), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Brewer*, 528 F.2d 492 (4th Cir.1975) (mail fraud conviction based on violation of statutory duty to file truthful tax returns).

Where the statute violated is not explicitly applicable to the defendant, there is no breach of duty that would support a mail fraud charge. *United States v. Dowling, supra*, 739 F.2d at 1449–1450; *see United States v. Gallant*, 570 F.Supp. 303, 308 (S.D.N.Y.1983) ("In order to successfully maintain a mail fraud prosecution under the Second Circuit rule [in a concealment case], the government must prove that the defendant breached [an explicit] duty to disclose separate from the commission of an otherwise criminal act."); *see also United States v. Bronston*, 658 F.2d 920, 926 (2d Cir.1981) (indicating in dictum that mail fraud prosecution should not lie "on the basis of a breach of ... duty accompanied by little more than a failure to disclose the breach to the person to whom the duty was owed ..."), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982).

 In this case, the information of which the government was supposedly deprived is information that the broker is obligated to provide (Count 23, ¶ 4 (United States defrauded of ability to gather "information required to be kept by [the broker]")). There is no explicit statutory obligation on the part of the buyer of a bond to provide information to the government, nor is a fiduciary relationship present. Thus, because there is no independent duty to disclose, there is no breach of duty that can support a mail fraud prosecution for concealment. The defendants may have interfered with a governmental function in violation of § 371, they may have breached the disclosure laws themselves, and they may have concealed a material fact within the jurisdiction of a government agency in derogation of 18 U.S.C. § 1001,[8] but they have not committed mail fraud.

This raises an obvious question: Why did the government not charge defendants with any of the various crimes that seem to be more directly implicated by the behavior alleged in the indictment? The probable answer: because none of those crimes is a RICO predicate offense, and mail fraud is, *see* 18 U.S.C. § 1961(1).[9] This emphasizes the danger in interpreting the mail fraud statute as the government would like. The

---

Barone was not the buyer of the bonds. It really belongs in the second category, however, because, according to the government, the purpose of the misrepresentation to the broker was to conceal the identity of the buyer from the United States, the alleged victim of the fraud.

**8.** See *supra* note 6.

**9.** In order to establish the "pattern of racketeering activity" element of a Racketeer Influenced and Corrupt Organizations Act ("RICO") violation, the government must show that at least two acts of racketeering activity have been committed. *See* 18 U.S.C. § 1961(5). These acts are known as predicate offenses, and are listed at 18 U.S.C. § 1961(1).

principle that criminal laws are to be strictly construed, *see United States v. Enmons*, 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973), which counsels against expansion of the mail fraud statute, is even more egregiously offended when that expansion would also subject the defendants to a RICO prosecution. *See Spiegel v. Continental Ill. Bank*, 609 F.Supp. 1083, 1089 (N.D.Ill.1985). Here the government is attempting to bootstrap defendants' conduct not only into a mail fraud offense, *see United States v. Gallant, supra*, 570 F.Supp. at 309, but also into a RICO violation.

If the Court were to accept the government's theory, "any crime ... could supply the 'fraud' element of a mail fraud violation," *id.; see United States v. Dowling, supra*, 739 F.2d at 1450, and any crime involving the mails would become a RICO predicate. If Congress had so intended, it would not have limited liability under both statutes to *fraud* involving the mails. Accordingly, because the conduct charged does not constitute mail fraud, Count Twenty-three must be dismissed.

### III. *The Securities Fraud Counts*

Defendants raise several objections to those portions of the indictment that charge violations of the anti-fraud provisions of the securities laws. Count Eight charges six defendants with conspiring to violate 15 U.S.C. § 78j(b) ("§ 10(b)")[10] and 17 C.F.R. § 240.10b–5 ("Rule 10b–5"),[11] and Counts Nine through Fifteen charge substantive violations of those provisions. The government alleges that John Russo, a

vice-president of Air Express International Corp. ("AEI"), misappropriated from his company confidential information relating to its proposed merger with Consolidated Freightways, Inc. ("CF"). He allegedly passed this information on to his co-defendants, who used it in engaging in stock transactions.

The first challenge is raised by defendant Calise. He alleges that he cannot be held liable for either conspiracy or any substantive crime because it is not alleged that he personally traded in AEI stock on the basis of inside information. All six defendants object to Counts Nine through Fifteen, which charge, in chart form, the seven transactions that are alleged to constitute the substantive violations. They argue that six defendants cannot be liable for a trade that is made in the name of only one person. Finally, all defendants seek dismissal of Counts Eight through Fifteen on the ground that the government will not be able to present evidence sufficient to sustain convictions on any of the securities charges.

Calise's theory appears to be that he has not been charged with a crime because he is not named in any of the overt acts contained in Count Eight. The indictment clearly alleges that Russo disclosed material nonpublic information to "his co-defendants and co-conspirators"—a group that would include Calise—but because the overt acts listed include trades by all defendants except Calise, he argues that he cannot be found to have violated his duty not to trade on the basis of inside information.

---

**10.** Section 10(b), 15 U.S.C. § 78j(b), provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of [Rule 10b–5].

**11.** Rule 10b–5, 17 C.F.R. § 240.10b–5, provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

. . . . .

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

Defendant Calise misperceives both the basis of Count Eight—it charges conspiracy—and the nature of the overt acts alleged therein. Count Eight states that the defendants violated 18 U.S.C. § 371[12] by conspiring to violate the anti-fraud provisions of the securities laws. The charge is sufficient if the offense the defendants are alleged to have conspired to commit is sufficiently identified, *see Wong Tai v. United States,* 273 U.S. 77, 81, 47 S.Ct. 300, 301, 71 L.Ed. 545 (1927), and one overt act in furtherance of the conspiracy is alleged. There is no requirement that every overt act committed be alleged, *United States v. Lam Lek Chong,* 544 F.2d 58, 63 (2d Cir.1976), *cert. denied,* 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977), or that every conspirator be alleged to have committed an overt act, *United States v. Brown,* 335 F.2d 170, 172 (2d Cir.1964). Accordingly, as long as the indictment properly charges that each defendant knowingly and willfully participated in a scheme to violate the securities laws and that one defendant committed an overt act in furtherance of that conspiracy, the fact that Calise is not named in any overt act is irrelevant.

The government's theory is that Russo—the insider/tipper—transferred to the other defendants—the tippees—material confidential information upon which the latter traded.

In *Cady, Roberts & Co.,* 40 S.E.C. 907 (1961), the [Securities and Exchange] Commission decided that a corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him.

. . . . .

The Commission emphasized that the duty arose from (i) the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure. *Id.,* at 912, and n. 15.

*Chiarella v. United States,* 445 U.S. 222, 227, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980) (footnote omitted). In *Dirks v. S.E.C.,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), the Court made clear that "the tippee's duty to disclose or abstain is derivative ... of the insider's duty." *Id.* at 659, 103 S.Ct. at 3263.

> As we noted in *Chiarella,* "[t]he tippee's obligation has been viewed as arising from his role as a participant after the fact in the insider's breach of a fiduciary duty." 445 U.S., at 230, n. 12, 100 S.Ct., at 1115, n. 12.
>
> Thus, some tippees must assume an insider's duty to the shareholders not because they receive inside information, but rather because it has been made available to them improperly. And for Rule 10b–5 purposes, the insider's disclosure is improper only where it would violate his *Cady, Roberts* duty. Thus, a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach.

*Dirks v. S.E.C., supra,* 463 U.S. at 659–60, 103 S.Ct. at 3263–64 (footnotes omitted). The insider breaches his fiduciary duty if he "will benefit, directly or indirectly, from his disclosure." *Id.* at 662, 103 S.Ct. at 3265.

When the indictment is viewed in light of these principles, it is clear that it properly sets forth the elements of tipper and tippee liability. Count Eight alleges that the defendants agreed to violate the

---

**12.** 18 U.S.C. § 371 provides, in relevant part: If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

securities laws by trading on the basis of inside information. Russo is alleged to be the tipper, who, for personal benefit, violated his fiduciary duties by disclosing to the other defendants confidential information about the AEI/CF merger. The tippees are alleged to have then engaged in various stock transactions, knowing that Russo had supplied the information in breach of his duties to AEI. This conduct, all of which is alleged to have been undertaken "unlawfully, willfully and knowingly," [13] is alleged to constitute a scheme which operated as a fraud and deceit on AEI and its directors, officers and shareholders. The indictment thus sufficiently charges conspiracy to violate § 10(b) and Rule 10b–5 and substantive violations of those provisions.

Defendants next argue, citing *State Teachers Retirement Board v. Fluor Corp.*, 592 F.Supp. 592 (S.D.N.Y.1984), that the indictment is defective in that it fails to allege that the tippees knew that the tipper acted for personal benefit. *Fluor Corp.*, 592 F.Supp. at 594, analyzed the two requirements for tippee liability after *Dirks v. S.E.C., supra*, 463 U.S. 646, 103 S.Ct. at 3255: 1) that the tipper has breached his duty to the shareholders of the company; and 2) that the tippee knows or has reason to know of the tipper's breach.

A tipper breaches his duty if he transfers material nonpublic information for personal benefit. *Dirks v. S.E.C., supra*, 463 U.S. at 662, 103 S.Ct. at 3265. For the tippee to know of the tipper's breach, therefore, the tippee must know that the tipper has transferred information, that that information is material and nonpublic, and that the tipper has done so for personal benefit. *See State Teachers Retirement Board v.*

*Fluor Corp., supra*, 592 F.Supp. at 594 (tippee must know "of *each element* of the tipper's breach") (emphasis in original).

But none of this helps the defendants to establish the invalidity of the indictment. *Fluor Corp.*'s determination that the tippee must know of each component of the tipper's breach arose in the context of a dispute over the proper jury charge in a Rule 10b–5 case. It was and is undisputed that knowledge of the breach, as an element of the offense, must be alleged in the indictment; *Fluor Corp.* merely held that knowledge of personal benefit, as an element of knowledge of the breach, must be explained to the jury. But nowhere in that case did Judge Sweet hold that the personal gain sub-element of the breach element, or the tippee's knowledge thereof, must be laid out separately *in the indictment.*

The indictment here states that Russo knowingly breached his duty, explains how, and alleges that the tippee defendants knew he had done so. That it does not explicitly define that breach of duty as disclosure of inside information for personal gain is of no moment. The indictment apprises defendants of the tippee-knowledge-of-tipper-breach element of the offense, *see generally Russell v. United States*, 369 U.S. 749, 762–69, 82 S.Ct. 1038, 1046–50, 8 L.Ed.2d 240 (1962), and the government will have to prove each component of that element at trial. But the indictment need not define every legal term contained therein; an indictment is not a jury charge. An allegation that the tippee knew of the tipper's breach necessarily

**13.** Calise's argument that the indictment fails to allege that any defendant acted with scienter is frivolous. Scienter, which is a requirement for a Rule 10b–5 violation, *see Aaron v. S.E.C.*, 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980), is "a mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1380, n. 12, 47 L.Ed.2d 668 (1976). Count Eight charges that the defendants knowingly and willfully agreed to violate the securities laws by employing schemes and artifices and engaging in practices which operated as a fraud and deceit. Counts Nine through Fifteen charge that the defendants knowingly and willfully employed those schemes and engaged in those practices, that Russo knowingly breached his fiduciary duties, and that the other defendants traded on the information knowing that Russo had done so. That the word "scienter" does not appear in the indictment does not alter the fact that the required mental state is clearly alleged.

charges that the tippee knew that the tipper was acting for personal gain.[14]

■ Each defendant next objects to being charged with a substantive violation based on a sale that, as a matter of public record, was made by only one person.[15] They overlook, however, the fact that the indictment charges all of them with aiding and abetting the crime. *See* 18 U.S.C. § 2.[16]

It is well settled that the guilt of a defendant may be established without proof that he personally did every act constituting the offense charged.

> To convict a defendant as an aider and abettor the Government must show only "that he in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938).

*United States v. Perry*, 643 F.2d 38, 46 (2d Cir.), *cert. denied*, 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981). That the allegedly fraudulent sales were not made in the name of each defendant is irrelevant where, as here, the defendants are charged with willfully and knowingly violating the securities laws and aiding and abetting in the violation of the securities laws in that, in employing schemes to defraud and engaging in fraudulent practices, they caused the sales to be executed.

■ The next contention is that Counts Eight through Fifteen should be dismissed because defendants anticipate that the government will be unable to present sufficient evidence to sustain the charges. Their position appears to be that the alleged inside information upon which the securities fraud violations are based was not in fact confidential. Defendants focus on the claim of Teamsters Locals 851 and

**14.** The government also contends that tippee knowledge of the tipper's personal benefit need not be alleged here because this prosecution is "being brought as both a 'tipper/tippee' and 'misappropriation of information' case." Government's Memorandum of Law at 157. Misappropriation cases involve defendants who trade on material nonpublic information they have obtained in breach of a fiduciary duty, though not necessarily one owed to the shareholders of the corporation the stock of which is being traded. *See, e.g., S.E.C. v. Materia*, 745 F.2d 197 (2d Cir.1984) (employee of financial printing company), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *United States v. Newman*, 664 F.2d 12 (2d Cir.1981) (securities trader tipped by employee of investment banking firm); *United States v. Carpenter*, 791 F.2d 1024 (2d Cir.1986) (financial reporter); *United States v. Reed*, 601 F.Supp. 685 (S.D.N.Y.) (son of corporate director), *rev'd in part on other grounds*, 773 F.2d 477 (2d Cir.1985).

The government argues that because personal benefit is not an element of misappropriation liability, "the indictment here need not allege that the tippees were aware of Russo's personal gain." Government's Memorandum of Law at 162. The theory appears to be that Russo misappropriated the information from AEI and then tipped the other defendants.

This approach is somewhat troubling because the government points to no cases in which the misappropriation theory has been used where the misappropriating defendant, like Russo here, is a traditional corporate insider. On the other hand, the recent indication from the Second Circuit is that the theory might appropriate-

ly be invoked in that context. *See United States v. Carpenter, supra*, at 1028 (rejecting argument of appellant financial reporter that "the misappropriation theory may be applied only where the information is misappropriated by corporate insiders or so-called quasi-insiders"). Defendants also suggest, citing language from *S.E.C. v. Materia, supra*, 745 F.2d at 203 ("One who misappropriates nonpublic information in breach of a fiduciary duty and trades on it to his own advantage violates section 10(b) and Rule 10(b)–5."), that in a misappropriation case the indictment must allege that the defendant traded on the misappropriated information to his benefit. In light of my holding that the indictment adequately alleges insider-tipper/outsider-tippee liability, however, I need not address whether insider-misappropriator/outsider-tippee liability could be established.

**15.** Defendants Vario, Frank Manzo, Calise, Russo, Leone Manzo and Barone are each charged with executing and aiding and abetting in the execution of seven separate short sales of AEI stock. Each transaction is the basis of a substantive count.

**16.** 18 U.S.C. § 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

295 that the unions had a right to veto the proposed AEI/CF merger, and assume the insider tip from Russo to be that if that claim went to arbitration, AEI stock would go down. That statement was also made by an AEI attorney in open court during the course of proceedings regarding a clause in the collective bargaining agreement giving the Locals the right to veto any merger or acquisition by AEI. Defendants thus argue that that information, as well as other information regarding the progress of the merger and the litigation, was publicly available, and that they therefore cannot be liable for insider trading.

Defendants' blithe assumptions about the nature of the inside information supplied by Russo unilaterally narrow the scope of the indictment. The government's proffer makes clear that it intends to prove that Russo knowingly disclosed to the other defendants a substantial amount of confidential information relating to various aspects of the proposed merger and the litigation it spawned, and that the defendants knowingly analyzed that information, traded accordingly, and sought to accomplish those transactions free of government scrutiny.

Defendants' belief that the government will not be able to prove that the information upon which the trades were made was in fact confidential is irrelevant in light of the well-settled principle that "[a]n indictment returned by a legally constituted and unbiased grand jury ..., if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956).

> [This motion does] not challenge the facial validity of the indictment, *see*, Fed.R. Cr.P. 12(b)(2), but rather attempt[s] to bring a motion pursuant to Fed.R.Cr.P. 29 before the government has presented its case. The motions are therefore premature and must be denied. *See United States v. Shakur*, 560 F.Supp. 366, 371

(S.D.N.Y.1983); *United States v. Cafaro*, 480 F.Supp. 511, 520 (S.D.N.Y.1979). A motion to dismiss for insufficient evidence can be decided only at trial, after the government has been put to its test, not before trial, based merely on assumptions of what the government's proof will be.

*United States v. Massino*, 605 F.Supp. 1565, 1581 (S.D.N.Y.1985), *rev'd in part on other grounds*, 784 F.2d 153 (2d Cir.1986).[17]

Accordingly, for the reasons stated above, the motions to dismiss Counts Eight through Fifteen are denied.

## IV. *Grand Jury Matters*

Defendants have made several motions relating to the events before the grand jury that voted this indictment. They first suggest generally that prosecutors abuse grand jury proceedings, and accordingly seek a variety of information relating to the presentation to the grand jury in this case. Their requests cover twenty categories and call for virtually everything but the testimony itself.

"Disclosure ... of matters occurring before the grand jury may [be ordered by the Court] upon a showing [by defendant] that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." Fed.R. Crim.P. 6(e)(3)(C)(ii). There has been no showing whatsoever in this case. Defendants' hope that their inspection of grand jury materials may reveal an irregularity that might warrant a motion falls far short of the demonstration of "particularized need ... or ... some similar compelling necessity," *United States v. Abrams*, 539 F.Supp. 378, 388 (S.D.N.Y.1982), that is required before grand jury secrecy will be disturbed. "Speculation and surmise as to what occurred before the grand jury is not a substitute for [the] factual basis [that must be] presented to warrant the extraor-

---

17. Defendant Calise also requests a pretrial hearing to determine whether the government has sufficient independent evidence linking him to the conspiracy, in order to determine in advance whether coconspirator hearsay will be admitted against him. That request is denied for the reasons stated in Part VII, *infra*.

dinary relief of disclosure of grand jury proceedings ..." *United States v. Wilson,* 565 F.Supp. 1416, 1436 (S.D.N.Y.1983).

The Court recognizes that there is something of a "Catch 22 implicit in [the] rule [that the defendant must] make a showing that grand jury proceedings were marred by irregularity ..." Morvillo, *Prosecutorial Power and The Grand Jury,* N.Y.L.J., April 1, 1986; *see United States v. Mechanik,* 472 U.S. 1016, 106 S.Ct. 938, 947, 89 L.Ed.2d 50 (1986) (Marshall, J., dissenting) ("[A] defendant often can make the necessary showing only with the aid of the materials he seeks to discover."). Nevertheless—rightly or wrongly—the courts have consistently held that conclusory or speculative allegations of misconduct do not outweigh the presumption of regularity of grand jury proceedings, *see generally Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed.2d 397 (1956); *United States v. Gordon,* 493 F.Supp. 814, 816–17 (N.D.N.Y.1980), *aff'd,* 655 F.2d 478 (2d Cir. 1981), or the need for secrecy, *see United States v. Beatty,* 587 F.Supp. 1325, 1334–35 (E.D.N.Y.1984); *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 398–401, 79 S.Ct. 1237, 1240–41, 3 L.Ed.2d 1323 (1959). *See, e.g., United States v. Wilson, supra,* 565 F.Supp. at 143; *United States v. Gordon, supra,* 493 F.Supp. at 816–17; *United States v. Olin Corp.,* 465 F.Supp. 1120, 1134–36 (W.D.N.Y.1979). It is not for a trial court to blaze a new trail around these precedents.

Accordingly, defendants are not at this time entitled to the information they seek, nor will the Court inspect the transcripts *in camera.* Grand jury materials will be turned over to defendants pursuant to the Jencks Act, 18 U.S.C. § 3500, and they can then make a motion if one is warranted.

■ Defendants' next request must be denied for similar reasons. They seek disclosure of the minutes on the ground that the grand jury may have been unnecessarily exposed to inflammatory statements re-

garding organized crime and the Lucchese Crime Family. Again, speculation regarding the grand jury presentation is insufficient to justify release of the transcripts. *See, e.g., United States v. Kalevas,* 622 F.Supp. 1523, 1525 (S.D.N.Y.1985). Moreover, blanket condemnation of organized crime references as unnecessary is not appropriate in this case. The grand jury was investigating an alleged RICO enterprise said to be the Lucchese Family. It would thus not be improper for the prosecution to present evidence of the structure and activities of that organization. *See* Part V, *infra.*

Defendant Davidoff moves to have the indictment dismissed on the ground that the grand jury was given an incomplete and unfair description of the facts involved in the Unions' rejection of AEI/CF merger. He alleges that the jurors were never told that a clause in the collective bargaining agreement gave the unions the right to veto any merger or that that right had been upheld in court.

Davidoff's allegation is based on his analysis of the grand jury testimony of Joseph Mailman.[18] Obviously, however, Mailman's appearance constitutes only a fraction of the presentation. The contention that the prosecution nowhere apprised the grand jury of the pertinent facts is thus no more than "speculation and surmise," *United States v. Wilson, supra,* 565 F.Supp. at 143, and therefore does not justify even release of the minutes, let alone dismissal of the indictment.

■ Defendants' final contention regarding grand jury proceedings is that the government is using the continuing investigation in order to prepare for trial. It is true that it "is improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial." *United States v. Dardi,* 330 F.2d 316, 336 (2d Cir.), *cert. denied,* 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964);

---

**18.** Mailman's grand jury testimony was made available to defendants prior to this pretrial deposition on July 24, 1985.

*see* 8 J. Moore, *Federal Practice* ¶ 6.04[5] at 6–86 (2d ed. 1984) ("[I]t is not a legitimate function of the grand jury to serve as a substitute for pretrial discovery.").

In this case, however, there is no indication of any improper motive on the part of the government. An inference of bad faith might be warranted where, for example, the timing of a grand jury subpoena is suspicious, *see, e.g., United States v. Dardi, supra,* 330 F.2d at 336 (witness called before the grand jury during trial); *United States v. Kovaleski,* 406 F.Supp. 267, 269–70 (E.D.Mich.1976) (witness called before grand jury after mistrial and prior to retrial), or when an inactive investigation is revived to question a particular witness, *see In re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Simels),* 767 F.2d 26, 29 (2d Cir.1985).

No such factors are present here. The grand jury is continuing its investigation of the air freight industry at JFK in a routine fashion, with an added inquiry into whether grand jury proceedings have been obstructed. There is nothing irregular in continuing to present evidence to a grand jury to determine whether superseding or additional indictments might be warranted. I am satisfied by the government's explanation that it is not "us[ing the] Grand Jury as a subterfuge to elicit testimony for use at ... trial." *United States v. Dardi, supra,* 330 F.2d at 336. Accordingly, and in the absence of any indication to the contrary, the motion for an order precluding the use at trial of any evidence obtained through the continuing grand jury investigation is denied.

## V. *The RICO Conspiracy Count*

Count One alleges a RICO conspiracy under 18 U.S.C. § 1962(d).[19] All defendants except Bono are charged with unlawfully, willingly and knowingly conspiring to conduct, and to participate directly and indirectly in the conduct of, the affairs of an enterprise—The Lucchese Crime Family—through a pattern of racketeering activity.[20] They object to Count One on several grounds.

■■■■ Defendants first argue that the indictment fails to plead a pattern of racketeering activity [21] because it does not allege that the racketeering acts [22] are related to each other by a common scheme or plan. In other words, they contend that the indictment must charge not only that the acts of racketeering activity are related to the enterprise, but also that the acts are tied to one another in some way.

This construction of RICO has been rejected by the Second Circuit.

[T]he statutory language does not expressly require that the predicate acts of racketeering be specifically "related" to each other and we find no affirmative evidence in the legislative history from which we should infer such a requirement. Furthermore, the broad spectrum of predicate acts of racketeering enumerated in section 1961(1) belies any intent on the part of Congress to require that such predicate acts of racketeering must possess a unitary character. While we agree with [defendant] that RICO was not intended to apply to sporadic and unrelated criminal acts, see S.Rep. No. 91–617, 91st Cong., 1st Sess., pp. 122, 158

---

**19.** 18 U.S.C. § 1962(d) provides:

It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

**20.** 18 U.S.C. § 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**21.** 18 U.S.C. § 1961(5) provides:

"pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

**22.** 18 U.S.C. § 1961(1) lists five categories of crimes that constitute racketeering activity.

(1970), we find that the statute was generally designed to avoid such an application. Most importantly, the predicate acts constituting a "pattern of racketeering activity" must all be done in the conduct of the affairs of an "enterprise." 18 U.S.C. § 1962(c). Thus, the enterprise itself supplies a significant unifying link between the various predicate acts specified in section 1961(1) that may constitute a "pattern of racketeering activity." *See United States v. Elliott,* 571 F.2d 880, 899 & n. 23 (5th Cir.) [*cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978)].

*United States v. Weisman,* 624 F.2d 1118, 1122 (2d Cir.) (footnote omitted), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980).

The indictment here alleges that the defendants agreed to conduct the affairs of an enterprise by committing the predicate acts. That enterprise—an organized crime family alleged to function by committing a variety of offenses—is the link between the acts of racketeering activity. "This is pattern enough to satisfy the statute; indeed, it is the pattern that most influenced Congress' decision to adopt RICO." *United States v. Castellano,* 610 F.Supp. 1359, 1392 (S.D.N.Y.1985).[23]

▬ Defendants also contend that the indictment does not allege the required nexus between the pattern of racketeering activity and the enterprise. *See generally United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246

(1981) (government must establish existence of enterprise and connected pattern of racketeering activity). This assertion is puzzling. The indictment plainly states that the purpose of the enterprise was to make money and that the defendants conspired to accomplish that end by engaging in a pattern of racketeering activity.

This allegation is insufficient, defendants appear to suggest, because it would subject a person to RICO liability even for an illegal act in which he engaged solely to make money for himself. They assert that the government must establish that the acts of racketeering activity were intended to benefit the Lucchese Family as an entity.

To accept this proposition would eviscerate RICO. Defendants could escape liability in virtually every case, unless they were foolish enough to keep the proceeds of their criminal activity in a separate bank account in the name of the illegal enterprise. Surely Congress did not intend such a restrictive interpretation, *see* Organized Crime Control Act of 1970, Pub.L. No. 91–452, § 904, 84 Stat. 922, 947 (1970) (RICO "shall be liberally construed to effectuate its remedial purpose"), and defendants have cited no authority to support it.

No defendant need fear a RICO conviction based on crimes committed solely to benefit himself as an individual, as opposed to a participant in the enterprise. The allegation that the predicate acts were committed in order to effectuate the enterprise— in other words, that the enterprise was

---

**23.** Defendants may be suggesting that the opinion in *United States v. Weisman,* 624 F.2d 1118 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980) lacks continued vitality in light of *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). In that case the Supreme Court indicated that a pattern may exist where " 'criminal conduct ... embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Id.* at 3285 n. 14 (quoting 18 U.S.C. § 3575(e)).

The predicate offenses alleged in Count One meet this standard. Certainly, "[s]everal isolated acts ... do not a pattern make." *Rojas v.*

*First Bank Nat'l Ass'n,* 613 F.Supp. 968, 971 n. 1 (E.D.N.Y.1985), but the crimes alleged here are not fairly characterized as sporadic or unrelated. The Hobbs Act predicates (Counts Two through Seven and Sixteen through Twenty-two) all involve extortion of labor peace payoffs from air freight companies operating at JFK. All involve Frank Manzo operating through a union official and one or more go-betweens. The securities charges (Counts Eight through Fifteen) involve several of the same defendants and are related to the merger of two air freight companies. The twenty-one predicates charged are thus not isolated, unrelated offenses, and they sufficiently allege a pattern of racketeering activity.

conducted through the pattern of racketeering activity—necessarily charges that the predicate acts were related to the enterprise. The government of course bears the burden of proving at trial that the defendants in fact agreed to conduct the affairs of The Lucchese Family by engaging in the pattern of racketeering activity alleged.

Defendants next argue that the enterprise alleged—The Lucchese Crime Family—is overinclusive, because the indictment does not charge all members or allege all crimes of that organization. Not surprisingly, they cite no authority to support the proposition that the existence of coconspirators or predicate acts other than those named in the indictment requires the dismissal of a RICO conspiracy count. Defendants' real apprehension seems to be that they will be unfairly prejudiced if the government, in attempting to prove the alleged enterprise, offers evidence that will lay "at [the] feet [of the defendants] all the misdeeds of the entire 'Lucchese Crime Family.'" Defendants' Joint Omnibus Motion at 117.

18 U.S.C. § 1961(4) defines an enterprise to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Count One describes the structure of the Lucchese Family and alleges that it constitutes an enterprise because it is a group of individuals associated in fact. To prove that fact, the government must introduce "evidence of an ongoing organization, formal or informal, and ... evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981).

The fear that it will be impossible for the government to do so without unduly prejudicing defendants is at best premature. The prosecution has stated that it will, as it should, seek rulings before presenting to the jury evidence that implicates defendants in other crimes. The determination whether any evidence is unfairly prejudicial must await the trial. Defendants' hope

that some of those decisions will go their way certainly does not warrant dismissal of Count One.

The next contention need not detain us long. Defendants argue that the RICO conspiracy count is defective because it fails to allege an overt act, and that if no such allegation is required, the statute is unconstitutional. The Second Circuit has made clear that 18 U.S.C. § 1962(d) does not require an overt act. *See United States v. Ivic,* 700 F.2d 51, 59 (2d Cir.1983); *United States v. Barton,* 647 F.2d 224, 237 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981). Nor is such an allegation required by the due process clause. *United States v. Castellano, supra,* 610 F.Supp. at 1395 n. 1 (citing *Singer v. United States,* 323 U.S. 338, 340–42, 65 S.Ct. 282, 283–84, 89 L.Ed. 285 (1945) (approving conspiracy conviction under section not requiring an overt act); *Nash v. United States,* 229 U.S. 373, 378, 33 S.Ct. 780, 782, 57 L.Ed. 1232 (1913) (same; statute "punishes ... conspiracies ... on the common law footing")). Finally, "this case raises no associational interests warranting first amendment concern." *United States v. Castellano, supra,* 610 F.Supp. at 1395 n. 1. Defendants are not being prosecuted for merely associating with one another; they are alleged to have agreed to associate for the purpose of conducting the affairs of The Lucchese Family through a pattern of criminal activity. *See id.*

Defendants also move, pursuant to Fed.R.Crim.P. 7(d), for an order striking from the indictment certain language they regard as unfairly prejudicial surplusage. Specifically, they object to those portions of Count One that describe the "Lucchese Crime Family" and the roles played by the "boss," "underboss," "capos" and "crews" of that organization. Defendants fear that these terms will inflame the jury and infect the proceedings with a "Godfather" mentality.

"Motions to strike surplusage from an indictment 'will be granted only where it is clear that the allegation complained of is

not relevant to the charge contained in the indictment and is inflammatory and prejudicial.'" *United States v. Ianniello*, 621 F.Supp. 1455, 1479 (S.D.N.Y.1985) (quoting *United States v. Klein*, 124 F.Supp. 476, 480 (S.D.N.Y.1954)). Defendants here are charged with association with an illegal enterprise that conducted its affairs through a pattern of racketeering activity. To prove its case, the government will properly present evidence of the identity of that enterprise and the roles within it played by the defendants. Accordingly, because the challenged allegations are clearly relevant to the RICO conspiracy the government will attempt to prove at trial, they will not be stricken. *See United States v. Persico*, 621 F.Supp. 842, 860 (S.D.N.Y.1985); *United States v. Castellano, supra*, 610 F.Supp. at 1428; *see generally United States v. Esposito*, 423 F.Supp. 908, 911 (S.D.N.Y.1976) (indictment may include allegations that are "relevant to the case and will constitute part of the government's proof at trial").

■■■ The final challenges to Count One involve the predicate offenses. Defendants argue that conspiracies cannot be charged as racketeering acts in a RICO conspiracy indictment. Defendant Santoro concedes that securities fraud conspiracies may be charged but contends that Hobbs Act conspiracies may not. Neither motion has merit.

The contention that conspiracy racketeering acts in a RICO conspiracy count impermissibly charge a conspiracy to conspire or conspiracies within a conspiracy has been rejected by the Second Circuit.

[A] RICO conspiracy under 18 U.S.C. § 1962(d), supported by predicate acts of racketeering activity that in themselves are conspiracies, [does not] violate the principle of *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), which prohibits conviction of multiple conspiracies under an indictment charging a single conspiracy. *United States v. Elliott*, 571 F.2d at 900–902. A RICO conspiracy under § 1962(d) based

on separate conspiracies as predicate offenses is not merely a "conspiracy to conspire" as alleged by appellants, but is an overall conspiracy to violate a substantive provision of RICO, in this case § 1962(c), which makes it unlawful for any person associated with an interstate enterprise to "participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity". *See United States v. Zemek*, 634 F.2d 1159, 1170 n. 15 (9th Cir.1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981).

*United States v. Ruggiero, supra*, 726 F.2d 913, 923 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). Thus, as long as the conspiracies alleged are proper predicates under the statute, the indictment is sufficient.

RICO defines certain groups of crimes as constituting racketeering activity. *See* 18 U.S.C. § 1961(1). Some of those groups include conspiracies. Section 1961(1)(D) defines as racketeering activity "any offense involving ... fraud in the sale of securities," and the Second Circuit has held that a conspiracy to commit securities fraud falls within this section and is thus a proper predicate offense. *See United States v. Weisman*, 624 F.2d 1118, 1123–24 (2d Cir.), *cert. denied*, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980).

The Hobbs Act conspiracy predicate falls under § 1961(1)(B), which defines racketeering activity to include "any act which is indictable under" 18 U.S.C. § 1951. That section—the Hobbs Act—makes it a crime to obstruct commerce by robbery or extortion or to attempt or conspire to do so.[24]

Defendants, citing *United States v. Ruggiero, supra*, 726 F.2d 913, and *Fireman's Fund Ins. v. Plaza Oldsmobile Ltd.*, 600 F.Supp. 1452 (E.D.N.Y.1985), contend that because conspiracy is not defined in § 1961 as racketeering activity, the Hobbs Act conspiracy is not a proper predicate offense. Their argument fails, because those cases stand simply for the proposition that

---

**24.** See *infra* note 29.

a § 371 conspiracy[25] to commit a crime listed in § 1961 is not a proper RICO predicate. A conspiracy to violate the Hobbs Act, however, is not a § 371 conspiracy; it is a violation of § 1951 itself, which has a built-in conspiracy provision. Section 1951 is a proper RICO predicate, so the indictment is not infirm on *Ruggiero* grounds.

Finally, defendants argue that because a Hobbs Act conspiracy does not require an overt act, *see Ladner v. United States*, 168 F.2d 771, 773 (5th Cir.), *cert. denied*, 335 U.S. 327, 69 S.Ct. 53, 93 L.Ed. 381 (1948); *United States v. Tolub*, 187 F.Supp. 705, 709 (S.D.N.Y.1960), it cannot be regarded as an *act* indictable under § 1951, and therefore cannot be a RICO predicate under § 1961(1)(B).

This niggardly interpretation of the statute cannot withstand scrutiny. In light of the fact that RICO is to be liberally construed to effectuate its remedial purposes, *see United States v. Mazzio*, 501 F.Supp. 340, 342 (E.D.Pa.1980), *aff'd without opinion*, 681 F.2d 810 (3d Cir.), *cert. denied*, 457 U.S. 1134, 102 S.Ct. 2961, 73 L.Ed.2d 1351 (1982), and in the absence of any authority from defendants to support their contention, the "act indictable" language is most reasonably read to mean "offense which can be charged."

Moreover, it is sophistry to argue that conspiracy is not an act merely because conviction does not require proof of an overt act. A defendant commits the crime of conspiracy by agreeing to violate the substantive provision; the agreement is the act, and that act is indictable under § 1951. It defies both logic and common sense to argue that the conduct that constitutes the crime—the agreeing—should be regarded as something less than an act simply because the government need not prove that an additional overt act was undertaken to effectuate the agreement. *See generally United States v. Brooklier*, 685 F.2d 1208, 1216 (9th Cir.1982) (holding that § 1951 conspiracy to affect commerce by extortion is proper predicate racketeering activity),

*cert. denied*, 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983).

Accordingly, for the reasons stated above, the motions to dismiss Count One are denied.

## VI. *Joinder and Severance*

Defendants have made various motions to sever. They argue that the offenses and defendants are improperly joined under Fed.R.Crim.P. 8, and that in any event the Court should exercise its discretion under Fed.R.Crim.P. 14 to order separate trials, thereby avoiding what they regard as the prejudicial effects of joinder. The government opposes all such motions except one. Because of a scheduling conflict with another case pending against defendant Santoro in the Southern District of New York, the government consents to his severance from this case, and it is so ordered. All other severance motions are denied for the reasons stated below.

### A. *Misjoinder*

■ Joinder in multi-defendant cases is governed by Fed.R.Crim.P. 8(b), which provides:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Courts in this Circuit have frequently discussed the application of this section to large RICO cases such as this.

> [T]he key phrase in Rule 8(b) is "same series of acts or transactions constituting an offense or offenses." It is well settled that this phrase permits joinder of crimes arising out of a common scheme or plan. *United States v. Weisman*, 624 F.2d 1118, 1129 (2d Cir.), *cert. denied*, 431 U.S. 905 [101 S.Ct. 209, 66 L.Ed.2d

---

**25.** See *supra* note 12.

91] (1977); *United States v. Bernstein,* 533 F.2d 775, 789 (2d Cir.), *cert. denied,* 429 U.S. 998 [97 S.Ct. 523, 50 L.Ed.2d 608] (1976); *United States v. Clemente,* 494 F.Supp. 1310, 1324 (S.D.N.Y.1980), *aff'd,* 670 [640] F.2d 1069 (2d Cir.), *cert. denied,* 459 [454] U.S. 820 (1981). It is equally well established that a conspiracy charge "presumptively satisfies Rule 8(b)," *United States v. Castellano,* 610 F.Supp. 1359, 1396 (S.D.N.Y.1985), because it "provides a common link and demonstrates the existence of a common plan." *Bernstein, supra,* 533 F.2d at 789. Similarly, a RICO conspiracy charge may provide the unifying link among the substantive crimes that form the basis of the pattern of racketeering activity for purposes of their joinder under Rule 8(b). *United States v. Tashjian,* 660 F.2d 829, 833 (1st Cir.), *cert. denied,* 454 U.S. 1102 [102 S.Ct. 681, 70 L.Ed.2d 646] (1981); *Weisman, supra,* 624 F.2d at 1129.

*United States v. Rastelli,* No. 85 CR 354, slip op. at 12 (E.D.N.Y. Feb. 27, 1986); *see United States v. Welch,* 656 F.2d 1039, 1051 (5th Cir.1981) ("[A] RICO conspiracy count can provide the connexity between two otherwise unrelated conspiracies necessary to satisfy the requirements of Rule 8(b)."), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982); *see also United States v. Bagaric,* 706 F.2d 42, 69 (2d Cir.) ("Virtually by definition, the pattern of racketeering alleged in this [substantive RICO] case constituted a 'series of acts or transactions' sufficiently intertwined to permit a joint trial of all defendants.") (citations omitted), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983).

■■ Thus, the ten defendants charged in the RICO conspiracy count are properly joined. Defendant Bono is in a different posture, in that he is charged only in Counts Four and Five, which allege extortion in connection with the proposed AEI/CF merger. That Bono is

> not indicted on the unifying RICO count ... does not affect the propriety of joinder under Rule 8(b). The Rule specifical-

ly provides that "all of the defendants need not be charged in each count" and this language has generally been construed to permit joinder in cases where individual defendants are charged with some but not all counts of the indictment.

*United States v. Weisman, supra,* 624 F.2d at 1129 (citations omitted).

> [E]ven if a defendant is not named in a conspiracy or RICO count, he may be charged in a separate count, in the same indictment, if he is alleged to have participated in the same series of acts or transactions that constituted the conspiracy or RICO offense, despite the fact that his participation may have been too limited to permit his being included as a co-conspirator or co-racketeer.

*United States v. Castellano, supra,* 610 F.Supp. at 1396–97 (citations omitted). Accordingly, all defendants, including Bono, are properly joined under Rule 8(b).

B. *Severance*

Fed.R.Crim.P. 14 provides, in relevant part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Defendants argue that jury confusion is inherent in a joint trial and will result in a prejudicial spillover effect. They contend that the disparate nature of the offenses and the varying roles of the defendants will make it impossible for any of them to get a fair trial.

> [T]he general rule [is] that persons jointly indicted may be jointly tried where the crime charged may be proved against all by substantially similar evidence. "Such a rule conserves judicial resources, alleviates the burdens on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials."

*United States v. Lyles,* 593 F.2d 182, 191 (2d Cir.) (quoting *United States v. Borelli,* 435 F.2d 500, 502 (2d Cir.1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971)), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979).

A joint trial serves several purposes. First, in a complex case like this, a joint trial permits the jury to see a comprehensive presentation of the entire enterprise and the role played by each participant therein. Second, a joint trial prevents the delay associated with separate, successive trials, thus serving the interests of "both the government and the accused." *United States v. McGrath,* 558 F.2d 1102, 1106 (2d Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978). Third, the Court must consider the safety of witnesses who, according to the government, would have to be called at each successive trial to repeat testimony.

*United States v. Persico,* 621 F.Supp. 842, 852 (S.D.N.Y.1985). The presumption in favor of joint trials is particularly strong "[w]here, as here, the crime[s] charged involve[ ] a common scheme or plan." *United States v. Girard,* 601 F.2d 69, 72 (2d Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979).

A defendant thus faces a "heavy burden," *United States v. Sotomayor,* 592 F.2d 1219, 1227 (2d Cir.), *cert. denied,* 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979), of demonstrating "prejudice so substantial as to deny him a fair trial," *United States v. Cody,* 722 F.2d 1052, 1061 (2d Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984). *See United States v. Fantuzzi,* 463 F.2d 683, 687 (2d Cir.1972) (defendant seeking severance must show "substantial prejudice from a joint trial, not just a better chance of acquittal at a separate one") (quoting *United States v. Borelli, supra,* 435 F.2d at 502). The burden is especially heavy where, as here, the defendants seek " 'to justify the disintegration of a trial ... in which there is a cohesion of crime alleged, defendants charged and proof adduced.' " *United States v. Persico, supra,* 621

F.Supp. at 852 (quoting *United States v. Kahn,* 381 F.2d 824, 840 (7th Cir.), *cert. denied,* 389 U.S. 1015, 88 S.Ct. 592, 19 L.Ed.2d 661 (1967)).

The ultimate question is whether, under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can a jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted.

*United States v. Kahaner,* 203 F.Supp. 78, 81–82 (S.D.N.Y.1962) (footnotes omitted), *aff'd,* 317 F.2d 459 (2d Cir.), *cert. denied,* 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963).

Having reviewed the defendants' contentions, the indictment, and the government's proffer in light of the principles enunciated above, I conclude that no severance is warranted in this case.

Repeated trials would be both burdensome and inefficient. The government estimates that a joint trial will take two to three months, while separate trials would take over a year. Moreover, individual trials for every defendant named in Count One would each entail proof of the existence of the alleged enterprise and the associated pattern of racketeering activity. Thus, because evidence regarding other defendants and predicate offenses would be properly introduced in separate trials, severance would do nothing to insulate defendants from the prejudice they contend will spill over from proof of codefendants' crimes if a joint trial is conducted.

Because separate trials will do little to aid the defendants, such a procedure would be a particularly unjustifiable imposition on witnesses and on governmental and judicial resources. In addition, the added delay would disserve both innocent defendants

and society's interest in the prompt punishment of criminals.

Further, the risk of jury confusion, while certainly present, has been greatly exaggerated by defendants. "[T]he charges in this case can be readily broken down into ... distinct areas of criminal activity." *United States v. Persico, supra,* 621 F.Supp. at 853. The twenty-six predicate acts allege extortion involving AEI, Schenkers International Forwarders, Inc., Three Way Corporation, Union Air Transport GmbH, Kamino Air Transport, Inc., and the AEI/CF merger, and insider trading centering on information about the AEI/CF merger. There is also one count involving fraud in the purchase of certain municipal bonds. With eight defendants remaining in the case, the jury should be able to "compartmentalize the evidence as it pertains to each defendant." *United States v. Rastelli, supra,* slip op. at 23. Joint trials have been permitted in recent cases far more complicated than this one. *See, e.g., id.* (seventeen defendants, sixty-four counts); *United States v. Persico, supra,* 621 F.Supp. 842 (fourteen defendants, fifty-one counts); *United States v. Castellano, supra,* 610 F.Supp. 1359 (twenty-four defendants, seventy-eight counts).[26]

Nor is this a case involving crimes of widely varying venality. The predicate acts all involve either extortion or securities fraud. Severance has been denied even where the indictment charged crimes as disparate as murder and possession of bootleg cigarettes. *See id.* at 1412–13.[27]

Finally, "[s]eparate trials are not justified simply because (i) in a joint trial evidence will be offered against one defendant which is not relevant to, or otherwise admissible against another defendant; or (ii) the defendants' roles in the conspiracy vary in scope or importance." *United States v. Persico, supra,* 621 F.Supp. at 853 (citations omitted). "[D]iffering levels of culpability and proof are inevitable in any multidefendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Carson,* 702 F.2d 351, 367 (2d Cir.) (citation omitted), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983).

In sum, there is no reason to believe that a jury will be unable to follow the court's instructions and to judge fairly the evidence against each defendant. Defendants' "contentions take insufficient account of the intelligence and conscientiousness of the jury, the effective efforts of the judge to keep it on the beam, [and] the skill of defense counsel...." *United States v. De-Sapio,* 435 F.2d 272, 280 (2d Cir.1970), *cert. denied,* 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971).

In addition to the foregoing arguments for severance, six of the defendants advance particularized contentions that require separate analysis.

#### a. *Santoro*

Defendant Santoro contends that Counts Four and Five, which charge extortion in relation to the AEI/CF merger, are improperly joined with Count One, the RICO conspiracy count. He argues that Counts Four and Five should be severed unless the government demonstrates the connection between the AEI/CF extortion and the RICO conspiracy. Because other

---

26. *United States v. Castellano,* 610 F.Supp. 1359 (S.D.N.Y.1985), was decided by Judge Sofaer, who denied motions to sever. When the case was reassigned to Judge Duffy, he chose to sever the case into several parts simply to make it more manageable. This indictment is much more limited in scope than was the one in *Castellano,* and Court, counsel and jury should be well able to handle the trial.

27. Defendants complain that the indictment in this case charges "an array of crimes ranging from murder to possession of bootleg cigarettes." Defendants' Joint Omnibus Motion at 31. Before muttering these lamentations, defendants would be well advised to read the indictment, which alleges neither murder nor bootlegging. Defendants, it would seem, have saved themselves some paperwork by submitting to this Court the identical severance motion that was made in *Castellano.* Defense counsel are cautioned to use greater care in recycling their motions.

defendants have joined in this motion, I shall address it despite Santoro's absence.

The argument overlooks the fact that the indictment charges that the crimes in Counts Four and Five were committed as part of the pattern of racketeering activity conducted by the enterprise alleged in Count One. That connection must of course be proven at trial. But the government need not do so at this stage simply to satisfy the defendants that the joinder is proper. "The established process for evaluating a motion under Rule 8(b) is to determine whether the defendants 'are alleged' to have participated in the same series of transactions...." *United States v. Castellano, supra,* 610 F.Supp. at 1397. The indictment alleges a connection between the RICO enterprise of Count One and the extortion charges of Counts Four and Five sufficient to warrant their trial together. The motion to sever pursuant to Rule 8(b) is therefore denied. Santoro's motion for a severance under Rule 14 based on spillover prejudice is denied for the reasons stated *supra.*

### b. *Davidoff*

Defendant Davidoff seeks a severance on the ground that he is alleged to have played only a minor role and will therefore be prejudiced by evidence of the activities of the other defendants. The government disputes this characterization of Davidoff's involvement, and also correctly points out that even defendants "charged with playing minor roles [are] not [entitled] to be tried separately; indeed if they are found to be intentional members of a charged conspiracy, the acts and conduct of the other members of the enterprise in furtherance of its objectives would be evidence against them...." *United States v. Ianniello, supra,* 621 F.Supp. at 1477–78.

Davidoff argues in addition that because four sets of extortions are charged in the indictment, the jury will not be able to keep track of the two with which he is alleged to have been involved. The potential for confusion is overstated. The number of counts here is not so overwhelming that a jury will be unable to follow the instructions of the Court and the arguments of the lawyers. Accordingly, Davidoff's severance motion is denied.

### c. *Raucci*

Defendant Raucci's motion for a severance on grounds of spillover prejudice and jury confusion is denied for the reasons stated *supra.*

### d. *Barone*

Defendant Barone argues that the insider trading counts are unrelated to the labor racketeering and extortion counts. The former charges, however, arise from the failed AEI/CF merger, which also resulted in extortion counts. In addition, even without this relation the counts could be tried together, because they are alleged to part of the same pattern of racketeering activity. The motion to sever under Rule 8(b) is therefore denied. Barone's Rule 14 severance motion is denied for reasons stated *supra.*

### e. *Russo*

Defendant Russo seeks a severance on the ground that multiple conspiracies have been improperly joined in a single indictment. This of course overlooks the unifying RICO conspiracy charge. The Rule 8(b) motion is therefore denied. Russo's Rule 14 motion is denied for reasons stated *supra,* particularly in Part VI.2.b.

### f. *Bono*

Because defendant Bono is not named in the RICO count, his severance motion deserves the most searching scrutiny. After careful consideration, however, I conclude that it too must be denied.

As noted above, see *supra* Part VI.A, Bono's joinder is proper under Rule 8(b). *See United States v. Weisman, supra,* 624 F.2d at 1129. His argument under Rule 14 is that because he is not alleged to be a member of the Lucchese Crime Family, he will be unfairly prejudiced in the eyes of the jury by references to organized crime

and by evidence of crimes of other defendants.

Bono's codefendants in Count Four and Five are Santoro, Vario and Frank Manzo, who are alleged to be, respectively, underboss, capo, and member of the Lucchese Family. The defendants are alleged to have exploited these roles, using and working within the hierarchy of the Family to accomplish the extortion of AEI and CF.[28] Thus, even if Bono were tried separately, evidence of the structure of the Lucchese organization would be introduced in order to explain to the jury the function of each defendant in the alleged conspiracy.

Finally, the risk of spillover prejudice is not sufficiently substantial to warrant a severance. The proof relating to the counts with which Bono is charged will constitute, in the government's estimate, half of the evidence at trial. Much of the evidence is thus properly admissible against him. The instructions of the Court and the ability of Bono's counsel should suffice to ensure that the jury does not consider against Bono that which is not.

Accordingly, for the reasons stated above, all severance motions are denied.

## VII. *Motions Relating to Trial Evidence*

### A. *Anticipated Insufficiency*

Defendants have made numerous motions to dismiss various counts on the ground that the government's evidence will be insufficient. As noted above, see *supra* Part III, these are premature Rule 29 motions based on conjecture as to what the proof will be. Defendant Davidoff's contentions, however, warrant brief discussion.

Davidoff seeks dismissal of Counts Four and Five, which charge him, Santoro, Vario, Frank Manzo, Bono, Calise and Russo with conspiracy and attempted extortion with regard to the failed AEI/CF merger. The indictment alleges that the defendants violated the Hobbs Act, 18 U.S.C. § 1951,[29] in that they conspired and attempted to commit extortion by obtaining "the property of the parties to the merger and their directors, officers and employees, to wit: a sum of money and other valuable commercial and contractual rights." This was allegedly intended to be accomplished

> by the wrongful use of the fear of financial and economic injury to the businesses of the parties to the merger, in that the defendants ... and others known and unknown to grand jury, threatened to prevent, and did in fact prevent, the merger of AEI and CF Air Freight, unless and until the parties to the merger, and their directors, officers and employees, paid a sum of money and granted other valuable commercial and contractual rights to the defendants....

Davidoff argues that because the mechanism through which the extortion was allegedly perpetrated—invocation of a collective bargaining agreement clause giving the union the right to veto the merger—was perfectly legal, he cannot be liable for any crime. This flies in the face of the established law. There is nothing new in the use of the Hobbs Act to prosecute a union official who seeks personal gain by invoking or threatening union action that is not itself illegal. *See, e.g., United States v. Palmiotti,* 254 F.2d 491 (2d Cir.1958) (Hobbs Act conviction of union business agent who solicited money from contractor

---

**28.** Although Bono is not charged with membership in the Lucchese Family enterprise, the government has stated that the evidence will show that he knew he was dealing with members of organized crime.

**29.** 18 U.S.C. § 1951 provides, in pertinent part:
(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
(b) As used in this section—
(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

by threatening work stoppage); *United States v. Postma,* 242 F.2d 488 (2d Cir.) (Hobbs Act conviction of union official and businessman doing business with strike-bound companies for conspiring to extort money from companies by threatening continuation of strike), *cert. denied,* 354 U.S. 922, 77 S.Ct. 1381, 1 L.Ed.2d 1436 (1957).

There is no requirement that both the means and the objective of the alleged extortionist each be wrongful when viewed independently. *See United States v. Clemente,* 640 F.2d 1069, 1077 (2d Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981). "Fear of economic loss is not an inherently wrongful means; however, when employed to achieve a wrongful purpose, its 'use' is wrongful." *Id.*[30] Accordingly, if the jury finds that the defendants used the legitimate power of the union to obtain personal benefits, that use can be wrongful and a conviction can be supported. *See United States v. Daley,* 564 F.2d 645, 650–651 (2d Cir.1977) ("[T]he corrupt abuse of the power of a union official ... is precisely the type of activity which the [Hobbs] Act was designed to embrace....") (citations omitted), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978).

Davidoff also argues that he cannot be found to have violated the Hobbs Act because, in his reading of the indictment, some of the allegedly illegal goals of the attempted extortion were in fact legitimate union objectives:

> With respect to that portion of the indictment [that charges that defendants sought to obtain 'valuable commercial and contractual rights'], the government's theory must be that the Union invoked its right to veto the merger, in an attempt to secure benefits related to union activities—either (1) adoption by CF of AEI's collective bargaining agreement with the union or (2) recognition of

the Union's claim to represent AEI employees in New Jersey and Connecticut. Defendants' Joint Omnibus Motion at 125.

Davidoff contends that a labor leader's attempt to secure such legitimate benefits for his union cannot be the basis of a § 1951 violation.

He has proven to be less than prescient with regard to what the government's theory "must" be. Its proffer makes clear that it will attempt to prove that the veto was invoked for several reasons. One legitimate goal was to force the merged AEI/CF to adopt the collective bargaining agreement. The alleged wrongful objectives were: 1) to obtain "a sum of money" —specifically, a $500,000 payment from AEI and CF to defendants; and 2) to obtain "other valuable commercial and contractual rights"—specifically, the retention of John Russo in a position of power in the merged AEI/CF company, and the acquisition by one or more of the defendants of the new company's trucking business. Thus, the defendants' extortion charge does not arise from their seeking something to which they were legitimately entitled. If the government can prove the facts alleged in the indictment, a proper Hobbs Act violation will have been made out. The motion is therefore denied.

Davidoff's motion to dismiss on the ground that the activities charged in Counts Four and Five are insufficiently related to the RICO conspiracy in Count One is denied for reasons stated in this section and in Part V *supra.* All other motions relating to the sufficiency of the trial evidence are denied as premature.

### B. James *Hearing*

■ Defendants seek a pretrial hearing to determine the admissibility of any statements the government may offer into evidence as coconspirator hearsay under Fed.

---

**30.** Davidoff's reliance on *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), is misplaced. The Supreme Court there held that the use of unlawful means to achieve legitimate union objectives is not proscribed by the Hobbs Act. *See id.* at 401, 93 S.Ct. at 1010. Here, of course, we have just the opposite: defendants are accused of having used legitimate union power to achieve unlawful personal objectives.

R.Evid. 801(d)(2)(E).[31] This procedure, which is the preferred (but not required) practice in some circuits, *see United States v. Ammar*, 714 F.2d 238, 246 (3d Cir.), *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *United States v. Montemayor*, 703 F.2d 109, 116–17 (5th Cir.), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *see generally United States v. James*, 576 F.2d 1121, 1127–32 (5th Cir.1978), *modified*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), has never been adopted by the Second Circuit.

That Court has made clear since *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), that co-conspirator "declarations that are otherwise hearsay may nonetheless be provisionally admitted pursuant to Rule 801(d)(2)(E))," *United States v. Margiotta*, 688 F.2d 108, 136 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983), "subject to the trial court's determination, made at the end of the government's case, that the non-hearsay evidence is sufficient, as to each conspirator against whom such statements are sought to be introduced, to show that he or she participated in the conspiracy," *United States v. Ianniello, supra*, 621 F.Supp. at 1478 (footnote omitted). I see no reason in this case to depart from this Circuit's settled procedure by conducting a mini-trial on coconspirator hearsay admissibility. Accordingly, the motion is denied.

#### C. *Audibility*

The parties agree that the Court should make pretrial determinations as to the audibility and admissibility of the various tapes the government intends to introduce into evidence. The procedure shall be as follows. The government shall, within ten days of the date of this order, identify those portions of the tapes and transcripts it intends to use. The government shall make every effort to delete that which is obviously unfairly prejudicial, irrelevant, or meaningless. Within ten days of receiving this information from the government, defendants shall state, in writing and with particularity, their objections to the proffered evidence. If after informal consultation the parties cannot agree on deletions, they shall so notify the Court, and hearings will be scheduled, probably for the end of July. The same procedure shall be employed for any tapes the defendants intend to introduce.

#### D. *Other Suppression Motions*

Defendants have made a general request to suppress statements and physical evidence. They specify neither the items they seek to suppress nor the grounds on which suppression is sought. Subject to protective orders entered on April 16, 1985 and January 28, 1986, *see* Fed.R.Crim.P. 16(d)(1), the government has informed defendants of statements and physical evidence in its possession, *see* Fed.R.Crim.P. 16(a)(1). Defendants have nevertheless failed to make their motions with any specificity. Accordingly, the motions are denied. *See United States v. Castellano, supra*, 610 F.Supp. at 1429.

Defendants also move to suppress any identification testimony. The government has stated that defendants Raucci and Frank Manzo have each been identified from photographs.

The name of the witness who identified Manzo has not been disclosed, and the government has indicated that he may not even be called at trial. The witness who identified Raucci is known but lives on the west coast.

The government requests that any hearings regarding the photographic identifica-

---

**31.** Fed.R.Evid. 801(d)(2)(E) provides:
 (d) *Statements which are not hearsay.*
 A statement is not hearsay if—
 (2) *Admission by party-opponent.* The statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

tions be deferred until such time as the witnesses are to testify. Defendants have not objected to this reasonable and efficient procedure. Accordingly, the government's request is granted.

### VIII. *Motions Regarding* Brady, *Discovery and a Bill of Particulars*

#### A. Brady *Material*

Defendants have made various requests for any and all materials which the government is obliged to provide under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, *see United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The *Brady* rule requires that the government disclose to the defendant material evidence in its possession which is exculpatory or otherwise favorable to the defense. *See United States v. LeRoy,* 687 F.2d 610, 618 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). There is no requirement, however, that that disclosure be made before trial, *United States ex rel. Lucas v. Regan,* 503 F.2d 1, 3 n. 1 (2d Cir.1974), *cert. denied,* 420 U.S. 939, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975), nor does *Brady* create a general constitutional right to discovery, *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977). "The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *United States v. LeRoy, supra,* 687 F.2d at 619 (citation omitted).

The government states that it has provided and will continue to provide *Brady* material in a manner that will avoid delay at trial and will enable the evidence to be of use to defendants in trial preparation. Ordinarily, "the assurance by the government that it has in its possession no undisclosed evidence that would tend to exculpate defendant justifies denial of a motion for inspection that does not make some partic-

ularized showing of materiality and usefulness." *United States v. Evanchik,* 413 F.2d 950, 953 (2d Cir.1969) (citation omitted).

I have carefully reviewed the defendants' requests and the government's response, and conclude that at this time there is no reason either to doubt the good faith of the government or to order disclosure. The government has represented that it will continue to disclose *Brady* material as its exculpatory nature becomes apparent. If there is any *Brady* information of which the government is aware but which it has not turned over, or which it does not disclose upon becoming aware that the information is favorable to the defense, it shall inform the Court of the nature of the material and its reasons for withholding it, so that appropriate rulings can be made. The government is also encouraged to seek the Court's guidance if it is unsure whether evidence constitutes *Brady* material.

#### B. *Discovery*

Defendants have made various motions pursuant to Fed.R.Crim.P. 16(a), (c) for discovery and inspection of evidence. The government has complied with many of the requests, has sought protective orders, *see* Fed.R.Crim.P. 16(d), with regard to others, and opposes the remainder. Certain categories of requests are briefly considered below.

 Defendants wish the government to identify its trial witnesses. Under *United States v. Cannone,* 528 F.2d 296, 301–302 (2d Cir.1975), the government's reasons for wanting to keep the information to itself must be balanced against defendants' specific showing of need for disclosure. Here the defense has made no such showing of particularized need; the "abstract, conclusory claim that [the witness list is] necessary to its proper preparation for trial," *id.,* falls short of the *Cannone* standard. *See United States v. Pastor,* 419 F.Supp. 1318, 1330 (S.D.N.Y.1975) (defense showing must be something more than

"the obvious assertion that the [witness] list would facilitate preparation for trial").

There is thus nothing to balance against the government's claim that disclosure of the witness list is likely to result in subornation of perjury, obstruction of justice and witness intimidation. In light of the existence of such a risk, disclosure of government witnesses is not warranted. Defendants have in their possession sufficient information [32] to prepare for trial.

■ Defendants also want statements of unindicted coconspirators and trial witnesses. *United States v. Percevault*, 490 F.2d 126, 131 (2d Cir.1974), makes clear that advance disclosure of these statements is not required. The government must, pursuant to the Jencks Act, 18 U.S.C. § 3500, turn over such statements after the witness testifies on direct at trial, but it is under no obligation to do so before that time. *United States v. Sebastian*, 497 F.2d 1267, 1269–70 (2d Cir.1974). Professional courtesy would suggest, however, that the government ought to discharge this responsibility a reasonable time before trial.

The next request is for the testimony of grand jury witnesses. If any of them testify at trial, their prior testimony will be turned over as § 3500 material at that time. With regard to the rest of the testimony, the motion is denied under Fed.R. Crim.P. 6(e) and for reasons stated in Part IV *supra*.

Defendants next seek disclosure of the identities of any confidential informants and undercover agents involved in this case. The Supreme Court in *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), noted that the government's privilege to withhold the identity of informants is not unlimited:

> Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.

. . . . .

> The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.* at 60–61, 62, 77 S.Ct. at 627–28.

Defendants here have made no showing that disclosure of informant information is needed for their defense, largely because, I assume, they are in the dark as to whether informants and undercover agents were in fact used during the investigation. The government has not said, nor has it suggested how disclosure in this case would harm the public interest. I therefore lack sufficient information to strike the balance mandated by *Roviaro*. Accordingly, the government shall, within ten days of the date of this Order, submit the following to the Court *in camera:*

> 1) a list of informants and undercover agents, if any, involved in the investigation;
>
> 2) a statement of the role of each, including whether he or she was directly involved in any actual criminal transactions charged;
>
> 3) any reasons why the government would oppose disclosure of the identity of any such informants or agents.

If after reviewing this material the Court believes that disclosure is warranted, the parties will be so notified.

I have carefully reviewed the remainder of defendants' discovery demands. Some of the material has been turned over, and some of it will be turned over at trial

---

**32.** The indictment names the victims of the alleged Hobbs Act violations and the broker involved in the bond transaction. Tapes, documents and surveillance applications and logs identify individuals involved in various counts. In addition, several witnesses have already testified in proceedings related to this case.

pursuant to 18 U.S.C. § 3500. All other requests are denied as beyond the scope of pretrial discovery under Fed.R.Crim.P. 16.

## C. *Bill of Particulars*

Defendants have requested that the government provide a wide variety of information in a bill of particulars. Fed.R. Crim.P. 7(f). A bill of particulars has three purposes: to 1) ensure that the defendant adequately understands the charges so that he can prepare his defense; 2) avoid unfair surprise at trial; and 3) enable the defendant to plead double jeopardy if subsequently prosecuted for the same offense. *United States v. Shoher*, 555 F.Supp. 346, 349 (S.D.N.Y.1983); *see Wong Tai v. United States*, 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927). Where "facts supplemental to those contained in the indictment ... are necessary to apprise the defendant of the charges against him with sufficient precision," *United States v. Persico, supra*, 621 F.Supp. at 868, a bill of particulars is appropriate.

This mechanism is not to be used, however, to force the government to disclose its evidence, *United States v. Gottlieb*, 493 F.2d 987, 984 (2d Cir.1974), or its legal theory, *United States v. Leonelli*, 428 F.Supp. 880, 882 (S.D.N.Y.1977). Nor may the government be forced to describe "the precise manner in which the crime ... is alleged to have been committed." *United States v. Andrews*, 381 F.2d 377, 377–78 (2d Cir.1967), *cert. denied*, 390 U.S. 960, 88 S.Ct. 1058, 19 L.Ed.2d 1156 (1968). The bill of particulars is not a general investigative tool for the defense. *United States v. Persico, supra*, 621 F.Supp. at 868; *see United States v. Salazar*, 485 F.2d 1272, 1278 (2d Cir.1973); *cert. denied*, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974); *see generally United States v. Shoher, supra*, 555 F.Supp. at 349–50.

▮ I have carefully reviewed the defendants' requests in light of the principles discussed above, and conclude that, with one exception, the demand must be denied. Among the factors considered by courts in determining whether particulars are warranted are the complexity of the offense, the clarity of the indictment, and the discovery otherwise available to the defendants. *See United States v. Shoher, supra*, 555 F.Supp. at 349. While this case is not uncomplicated, it can be broken into distinct areas of criminal activity. See *supra* Part IV.B. The indictment is quite detailed, and defendants have received voluminous discovery materials. Much of the information they seek to have the government particularize is already available to them in these documents.[33] The material defendants want is so broad and so detailed that its provision "would amount to a point by point revelation of each morsel of the government's proof." *United States v. Goldman*, 439 F.Supp. 337, 352 (S.D.N.Y. 1977).

▮ The one respect in which the government will be required to particularize its allegations involves Counts Eight through Fifteen, the securities fraud charges. The indictment states that John Russo supplied to his codefendants "confidential, material, nonpublic information relating (a) to the proposed merger of AEI and CF Air Freight in 1983, and (b) to litigation between AEI and Teamsters Locals 295 and 851 concerning the proposed merger of AEI and CF Air Freight in 1983." Defendants wish to be enlightened as to the precise nature of the inside information on which they are alleged to have traded. I agree that a defendant cannot be expected to defend against a charge of insider trading without knowing what the inside information is. Accordingly, the government shall, within ten days of the date of this Order, describe as specifically as possible the information to which the above-quoted language refers.

All other requests for particulars are denied for the reasons stated above.

---

**33.** In addition, the government has agreed to provide a list of alleged coconspirators not named in the indictment.